**MONROE AUTO EQUIPMENT COM-
PANY, a Michigan corporation,
Petitioner,**

v.

**FEDERAL TRADE COMMISSION,
Respondent.**

**No. 14824.**

United States Court of Appeals
Seventh Circuit.

June 16, 1965.

Rehearing Denied July 15, 1965.

Richard F. Hahn, Harold T. Halfpenny, James F. Flanagan, Mary M. Shaw, Chicago, Ill., for petitioner, William Woodward, Jr., Monroe, Mich., of counsel.

J. B. Truly, Asst. Gen. Counsel, Thomas F. Howder, Atty., F. T. C., James McI. Henderson, Gen. Counsel, Washington, D. C., for respondent.

Before SCHNACKENBERG and CASTLE, Circuit Judges, and GRUBB, District Judge.

SCHACKENBERG, Circuit Judge.

Monroe Auto Equipment Company, a Michigan corporation, petitioner, by its petition asks us to review and set aside an order of the Federal Trade Commission which commanded Monroe to cease and desist from discriminating in the price of automotive products of like grade and quality, in commerce, by selling same to any purchaser at net prices higher than the net prices charged any other purchaser who competes in the resale or distribution of such products with the purchaser paying the higher price,

in violation of § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a).[1]

By its complaint, the Commission alleges that Monroe sells automotive products in the so-called "after market", which is classified by Monroe into "warehouse distributors (WDs)" and "jobbers". It sells directly only to WDs who normally resell only to jobbers. The complaint alleges that WDs purchase from Monroe at "Suggested Net Jobber Cost Sheet" prices and that, under the terms of a WD agreement, they receive a 20% allowance on all such sales to jobbers reported by them to Monroe. Monroe grants such an allowance to WDs only on sales to jobbers who have signed contracts approved by Monroe and on sales made at prices set forth in Monroe's published "Suggested Net Jobber Cost Sheet".

Monroe sells to about 300 customers classified as WDs, in the United States.

A jobber is normally engaged in re-selling automotive products to vehicle fleets, garages, gasoline service stations, and others in the automotive trade. Such a jobber signs a "Monroe Auto Equipment Company Jobber Agreement" with a WD, and such agreement is approved and signed by Monroe.[2]

The complaint concludes that the effect of such price discriminations may be substantially to lessen competition or tend to create a monopoly, or to injure, destroy or prevent competition, in violation of § 2(a) aforesaid.

The charges in the complaint are denied by Monroe in its answer, which also sets up as a defense that if any price differentials exist they are justified by a due allowance for differences in cost or have been made in good faith to meet an equally low price of a competitor.

However these defenses were not pressed and are not now live issues.

The parties stipulated many of the basic facts and the testimony of Monroe's vice-president Bickel, in charge of merchandising, was received. Subsequently, on his own motion, the examiner reopened the record and the testimony of four witnesses was taken and documentary exhibits were introduced.

Thereafter the record was closed and, the parties having submitted proposed findings, an initial decision, finding the facts, was filed by the examiner, in which he concluded that Monroe had violated the law as alleged and directed issuance of an order to cease and desist.

In addition to the stipulated facts, which are incorporated in his decision, the examiner's findings, as summarized, are as follows: The evidence established a course of dealing by the petitioner, its WDs and its jobbers, which resulted in an "indirect purchaser" relationship between Monroe and the jobber-purchasers of its products, resulting in direct dealings between Monroe and the jobbers and Monroe's fixing of prices, terms and conditions of sale. He held that, even though certain of the affiliated WDs and jobbers were separate corporate entities, the effect of the relationships between them was that the jobbers received the benefit of WD allowances and that a failure to disregard the corporate entities would permit certain customers of Monroe a price advantage over their competitors which would violate the statute if the corporate device were absent.

The examiner found that Monroe's granting of the 20% WD allowance on "so-called 'sales'" to jobbers owned or controlled by WDs and indirectly to jobbers who owned or controlled WDs, resulted in price discriminations far in ex-

---

1. It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. * * *.

2. There are approximately 11,000 such jobber-purchasers in the United States.

cess of the average net profit usually earned by automotive parts jobbers. He then concluded that discriminations of such magnitude necessarily enhanced the competitive opportunities of the favored purchasers and that their effect "may be substantially to lessen competition, or to injure, destroy, or prevent competition" in violation of section 2(a).

On appeal by Monroe, the Commission heard the matter on briefs and oral argument, and by its decision modified the examiner's decision. While agreeing with the examiner's application of the "indirect purchaser" doctrine to transactions between Monroe and independent jobbers not affiliated with a WD, the Commission rejected this doctrine as to Monroe's dealings with affiliated WD jobber entities and found instead that the latter were direct purchasers from Monroe. Treating, as the "sole remaining question", whether there was sufficient evidence of identification of the WDs with their jobbers to give rise to the conclusion that a discount given to one will enure to the benefit of the others,

the Commission examined the testimony, made findings, and concluded that "for all practical purposes" these organizations operate as a single unit so that any benefit conferred on one would, in the light of the business realities shown on this record, result in a direct benefit to the other.

The Commission considered Monroe's rebuttal evidence and concluded that it had "fallen short of the mark".

Having modified and supplemented the initial decision, it was then adopted as the decision of the Commission.

■ In this court, Monroe contends that the Commission erred in equating an (assumed) economic benefit arising from common ownership with a price discrimination under section 2(a). We are required to accord conclusive effect to the Commission's findings of facts, if supported by substantial evidence. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456. There is such substantial evidence in this record[3] that

3. An illustrative situation is that of Hart's Automotive Parts Company, Inc., of which R. Henry Hart, Jr. was president and controlling stockholder. Hart's was engaged in warehousing and distributing automotive parts to all classes of automotive customers, with its main office located at 1230 Market Street, Chattanooga, Tennessee. At this address, according to the witness, the company functioned as a WD under the name of Auto Parts Warehouse Company, and maintained a sales counter for servicing the jobber trade. At the same time, it maintained another sales counter in the same building for selling as a jobber to the dealer trade. Within Chattanooga itself, the company operated three unincorporated branches (in addition to the main office), each of which functioned solely as a jobber, obtaining their products from Harts' central office warehouse.

In addition to Harts' Chattanooga operations, Mr. Hart testified that outside that city it maintained four jobber corporations, all named Hart's Automotive Parts Company, viz., at Dalton, Georgia, with a branch at Chatsworth; at Cleveland, Tennessee; at Maryville, Tennessee, with a branch at Madisonville; and at Harriman, Tennessee, with a branch at

Rockwood. The Commission found that each of these corporations had likewise been signed by Hart's Chattanooga headquarters to Monroe-approved jobber contracts. Mr. Hart acknowledged that each of them, with one exception, was opened with capital supplied primarily by himself, and that he derived his basic income from the Hart's Automotive operation. In each of these corporations, again with one exception, the witness testified that he was majority stockholder, as well as president and chairman of the board.

He stated that monthly meetings were held in Chattanooga, which were attended by the store managers and their salesmen.

Mr. Hart likewise testified that the general books of all out-of-town companies were kept in Chattanooga, and that Hart's employed two full-time bookkeepers and one part-time for this purpose. He explained that while each company wrote its own daily invoices, their monthly billing statements were forwarded to purchasers from Chattanooga. In addition, he stated that while each jobber had a local bank account, only four persons were authorized to sign checks on their behalf, with at least two signatures re-

Monroe sold to direct-buying WD-jobber entities for redistribution through affiliated jobber outlets at an allowance of 20%, while independent jobbers, in competition with these same outlets in the resale of Monroe products, were required to pay regular jobber prices on their "indirect purchases" from Monroe through WDs.

In this court Monroe relies on Nuarc Co. v. Federal Trade Commission, 7 Cir., 316 F.2d 576, 582 (1963), where we set aside an order entered by the Commission finding that Nuarc had violated § 2(d) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(d). Nuarc is not controlling here for at least two reasons; first, it involved a § 2(d) proceeding and secondly, the evidence in Nuarc did not support the order of the Commission, as we held in that case.

Petitioner contends that the "Government's case must fall" because a "probative analysis" of the facts in the case fails to show a causal relationship between price discriminations and an actual or reasonably probable injury to competition. However, as we said in E. Edelmann & Co. v. Federal Trade Commission, 7 Cir., 239 F.2d 152, at 154:

"* * * The test of injury to competition has been formulated in various ways. In the Corn Products case, [Corn Products Refining Co. v. Federal Trade Commission], 324 U.S. [726] at page 738, 65 S.Ct. [961] at page 967 [89 L.Ed. 1320], * * * the Court stated, 'The use of the word "may" was not to prohibit discriminations having "the mere possibility" of those consequences, but to reach those which would probably have the defined effect on competition.' Later in the opinion, however,

324 U.S. at page 742, 65 S.Ct. at page 969, * * * the Court stated, 'As we have said, the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect.' * * * "

■ We hold that, in the case at bar, according to the proper competitive injury criteria, the Commission properly affirmed the examiner's finding that petitioner's discriminatory allowances would be likely to result in the requisite anticompetitive effects proscribed by the Act.

Petitioner seeks to rely on our recent holding in Central Retailer-Owned Grocers, Inc. v. Federal Trade Commission, 7 Cir., 319 F.2d 410 (1963), as to which no petition for certiorari was filed in the United States Supreme Court. However, in Central, the Commission in its complaint took the position that the sums Central received and accepted from certain of its suppliers constituted brokerage or allowances in lieu of brokerage, in violation of § 2(c) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(c). It was upon that theory alone that the case was submitted to and decided by us. No such theory has been asserted in the case at bar; our holding in Central is inapposite here.

■ Lastly, we cannot see any unclearness or imprecision in the Commission's order, the terms of which are so unmistakable and unequivocal as to have produced two able briefs in this court by learned counsel for petitioner.

From our examination of the entire record, we hold that the findings and conclusions of the examiner, as modified, supplemented and adopted by the Commission, are supported by the evidence in the record and the principles of law per-

quired; Mr. Hart, Mr. Johnson, vice-president, the head bookkeeper in Chattanooga, and each respective store manager.

The witness also testified that the stockholders' meetings for all the various Harts' corporations were held at the

central office in Chattanooga on the same day, and that a consolidated balance sheet covering all operations was prepared.

Mr. Hart additionally pointed out that his salesmen were paid no commission on "sales" by Chattanooga to its affiliated jobber stores.

taining thereto. Therefore, the order of the Commission should be and is affirmed, and will be enforced by this court.

Order affirmed.