**DAYCO CORPORATION, Petitioner,**
v.
**FEDERAL TRADE COMMISSION,**
**Respondent.**
**No. 16215.**

United States Court of Appeals
Sixth Circuit.
June 17, 1966.

Carleton A. Harkrader, Washington, D. C., Joel E. Hoffman, Wald, Harkrader & Rockefeller, Washington, D. C., on brief; Kennedy Legler, Jr., Dayton, Ohio, of counsel, for petitioner.

Alvin L. Berman, Federal Trade Commission, Washington, D. C., James McI. Henderson, General Counsel, J. B. Truly, Asst. General Counsel, Thomas F. Howder, Richard C. Foster, Attorneys, Federal Trade Commission, Washington, D. C., on brief, for respondent.

Before WEICK, Chief Judge, and O'SULLIVAN and PHILLIPS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

The petition of Dayco Corporation of Dayton, Ohio, asks our review of a decision of the Federal Trade Commission which found that it was violating Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling like products to competing sellers at different prices and violating Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, by entering into agreements to fix resale prices. The FTC's complaint was filed October 1, 1959, and its final order, which in part adopted a Hearing Examiner's initial decision, was entered August 5, 1964.

Dayco Corporation makes and markets automobile replacement parts. Its share of the national market is estimated at 15%, as against 65% controlled by Gates Manufacturing Co. Another company has about 5%, and the balance is shared by smaller companies. The FTC found that "The operations of that department [Dayco's automotive replacement parts] have not been very profitable in the past several years, an actual loss having occurred in 1960, which was described as a 'disastrous year'." Count I of the FTC complaint dealt with the alleged price discrimination and Count II with the alleged price fixing.

1) *Price discrimination.*

The FTC complaint, after general charges of price discrimination between competing purchasers, the effect of which was to impair competition, specified the following as the wrongful conduct of Dayco,

"(a) Granting rebates and allowances of up to 20% off its wholesaler price schedule to some of its direct wholesaler purchasers while denying such rebates and allowances to other such wholesaler purchasers; and

"(b) Charging its indirect wholesaler purchasers prices which are up to approximately 25% higher than the prices it charges its direct wholesaler purchasers."

The distribution structure through which Dayco assured the availability of its products involved basically a three level turnover: (1) warehouse distributors; (2) direct and indirect jobbers; (3) dealers—retail outlets (garages, etc.). Dayco did not sell to retailers. The need for this separation of functions arises from the nature of Dayco's products. These include fan belts, radiator and heater hoses, and other principally rubber or plastic automotive replacement parts. These items must be stocked in a broad range of styles and sizes to fit differing makes and models of cars.

The various distributional levels reflect the needs of the market with the retailers stocking only the most popular items, the jobbers keeping a somewhat broader range, and the warehousers stocking the full spectrum of sizes and styles.

Although Dayco's efforts to stimulate the market for its products were directed at all levels of distribution, it sold only to jobbers who, from the standpoint of price were, on the one hand, warehouse distributors and jobbers who resold only to other jobbers; and, on the other hand, jobbers who resold to retailers. The violation was found in the fact that those of Dayco's customers who resold only to jobbers received generally a rebate of 20% off of the list price, while the jobbers who resold to retailers (dealers) paid the full wholesale list price.

To make out its case, the FTC first took the testimony of Dayco's sales manager. He described Dayco's methods of marketing its products, explaining the reasons for and the necessities and advantages of such methods. His testimony disclosed the complexities of Dayco's dis-

tribution system and although it did not attempt accurate cost justification for the lesser price charged to warehouse distributors, it did disclose the operational advantages of selling through warehousers and other jobbers who resold only to jobbers. The evidence disclosed the development nationwide of warehouse distributors through whom Dayco had to deal to survive competitively, and who demanded a price discount in exchange for the advantage to Dayco's distribution that flowed from such methods. From the testimony first adduced, it could not be said that those customers who received the 20% discount, wholesalers and jobbers who resold only to jobbers, were in competition with jobbers who were selling directly to the retailers. A contrary view, however, was the basis for the Commission's ultimate conviction of petitioner of violation of the Robinson-Patman Act. It contended, and by employment of the procedural device of official notice hereafter discussed, found, that one such warehouse distributor was but a bookkeeping device used to camouflage what were in effect direct sales to jobber members of a cooperative buying group formed to take advantage of the 20% discount offered to "warehouse distributors" by Dayco. It further found that these particular jobbers then sold, at a substantial competitive advantage, to retailers in competition with other jobbers who did not have the benefit of such a discount.

The mechanics of operating this system for any individual purchase (as found by the Commission) involved Dayco billing the nominal warehouse for the discounted wholesale price, and the warehouse in turn billing its jobber-member for the same discounted price plus a service charge of 0%, 2% or 5%, depending on the method of storage, delivery and packaging. Any profit derived from these charges would be returned to individual jobbers at the end of the year in proportion to their purchases.

We forego recitation of additional details of Dayco's methods of distribution and the market in which it was competing; they are not necessary to our decision. Better understanding of methods under attack could be gained by reading the cases of General Auto Supplies v. FTC, 346 F.2d 311 (CA 7, 1965) and Monroe Auto Equipment Co. v. FTC, 347 F.2d 401 (CA 7, 1965) which sustained findings of violation, in the one by a manufacturer, and in the other by distributors in the automotive replacement parts business.

After taking of the testimony of the sales manager of Dayco, which admittedly did not make out the case which we have narrated, the FTC's trial examiner entertained and granted a motion made by "counsel supporting the complaint," denominated "Motion to Take Official Notice and to Recognize Presumptions."

If the FTC's use of official notice to make out its case of price discrimination went beyond permissible limits, its decision must be reversed. That the validity of its decision depends upon the procedural propriety of its taking such notice was conceded by the FTC in its decision as follows:

"Since the proof of *several essential elements* of both price discrimination charges [1] hinges upon whether the *examiner acted correctly in taking official notice*, that question will be discussed before we turn to the other questions raised on this appeal." (Emphasis supplied.)

The official notice used by the FTC here was, in the main, the appropriation for this case of testimony and findings which FTC had taken and made in a previous case in which it had prosecuted and convicted a Dallas concern, Automotive Jobbers, Inc., (hereafter, AJI) for violation of Section 2(f), 15 U.S.C. § 13(f). Upon the proofs in that case, the Commission found that AJI was a so-called "buying group" of jobbers dealing in automotive replacement parts who had,

---

1. A second charge of discrimination, flowing from a six-year-prior pricing practice, was dismissed by the Commission.

as members thereof, organized a corporation which maintained a warehouse in Dallas and purchased products of Dayco and other suppliers; that AJI obtained substantial discounts from its suppliers list prices and so resold to its jobber-members as to pass on to them a substantial portion of the discounts; that this was accomplished by billing the jobbers at the discount price plus a service charge of 5% on purchases made from the warehouse supply, 2% where the purchases went first to the warehouse and then were immediately transshipped to the jobber—a "slot" shipment, and no charge when the purchases were delivered directly to the jobber from the supplier—a "drop" shipment. While the record is unclear, there was evidence of some cases where the jobber purchasing from AJI was billed at Dayco's list price but shared in the discounts because, as found by the official notice, AJI "annually or periodically distributed to the jobber-members all discounts and rebates received, less operating expenses, in proportion to the amount of each member's individual purchases." The proofs and findings officially noticed were also to the effect that AJI operated a warehouse in which it "usually maintained at least a minimum stock of the suppliers' automotive products"; that AJI was billed for its purchases by Dayco and other suppliers and settled all of its accounts for goods ordered, whether stored in its warehouse or "drop" or "slot" shipped to AJI's customers; that AJI made no sales to retailers or dealers, but only to jobbers; that any independent jobber in the same area as AJI or elsewhere who resold its purchases from Dayco only to other jobbers enjoyed the same discounts as were afforded AJI; and that jobbers who purchased from Dayco and directly resold to retail dealers, were not given such discounts.

The FTC also took official notice of facts developed in its Automotive Jobbers, Inc., case disclosing the internal organization of that concern, its by-laws, its corporate purpose "to receive quantity discounts" and the identity of thirteen of its members doing business in some ten different cities in Texas. It went on to find by official notice that jobbers in various Texas cities were in competition with each other, whether members of AJI or not, the critical application being that AJI members who purchased from AJI and resold to retail dealers were in competition with other jobber customers of Dayco who sold to retail dealers. The following were contained in the official notice:

"(n) In practice and effect, AJI has been, and is now, serving as the medium or instrumentality by, through, or in conjunction with, which its jobber members exert the influence of their combined bargaining power on the competitive suppliers hereinbefore described. As a part of their operating procedure, said jobber members direct the attention of suppliers to their aggregate purchasing power as a buying group and have demanded and received, upon their individual purchases, the prices, discounts, allowances and rebates hereinbefore referred to. Suppliers not acceding to such demands are usually replaced as sources of supply for the commodities concerned and such market is closed to them in favor of such suppliers as can be, and are, induced to afford the prices, discounts, allowances and rebates so demanded."

The official notice then concluded that:

"3. Based upon facts found and presumptions and inferences made by the Commission and the courts in prior decisions (cited at pages 8 and 9 of the present motion), the following facts and presumptions are officially noticed as prima facie evidence for the purposes of this proceeding:

(a) Automotive parts jobbers located in the same cities and metropolitan areas, and in cities and towns in geographic proximity, are in competition with each other; and, specifically:

\*　　\*　　\*　　\*　　\*　　\*

(b) The Automotive parts industry is a highly competitive business involv-

ing small margins of profit. Typically automotive parts jobbers realize a net profit after taxes of less than five per cent, and the net prices paid by jobbers is of such importance that they are careful to take advantage of a discount as small as the two percent cash discount, prevalent in the industry, in paying their bills, the failure or inability to take such a discount being of the utmost economic importance to such jobbers' competitive existence."

Without further extension of the subject, it will be sufficient to say that, by his order, the FTC's trial examiner substantially granted the entirety of what the motion therefor asked, namely:

"Certain facts found by the hearing examiner in an initial decision filed October 13, 1961, and adopted by the Commission on January 4, 1962, in Docket No. 7590, with respect to *the character, membership, purposes, methods of operation, and procedures of the primary respondent* in that case, Automotive Jobbers, Inc." (Emphasis supplied.)

The Initial Decision of the Trial Examiner repeated for his Findings of Fact substantially all of the facts which he had officially noticed. That his finding of Dayco's guilt was entirely the product of his use of the specific record made in Automotive Jobbers, Inc., 60 FTC 19 (1962) is made plain by his finding No. 65. Therein he refused the request of counsel supporting the complaint to find that Dayco had violated the law in its dealings with "fifteen other buying groups." He said,

"Counsel supporting the complaint persuasively argues that the record also shows that Dayco sold its products to fifteen other buying groups at the same prices and under the same terms and conditions as to AJI, and with similar competitive effects (CSC proposals, pp. 6–9). *The record does not contain any reliable evidence, however, showing the internal organizations and methods of operation of such other buying groups.* The testimony and

other evidence provide a basis for suspecting that the other buying groups operate in much the same fashion as AJI; and that, in selling to them at prices applicable to products for resale to jobbers, Dayco granted similar price advantages to their members with similar competitive effects. *But the record does not, either directly or by sound inference, establish such suspicions as facts. Accordingly, it cannot be concluded on this record that Dayco has granted unlawful price discriminations to other buying groups or their members."* (Emphasis supplied.)

The complaint against Dayco was not limited to claimed illegality in its selling to Automotive Jobbers, Inc., and the foregoing quotation from the Trial Examiner's decision makes clear that except for incorporating by reference virtually its entire case against that concern, the FTC failed to sustain the charge of its complaint. The Final Order of the Commission did not limit its cease and desist command to Dayco's dealing with Automotive Jobbers, Inc., despite its examiner's finding that no case had been made except as to such concern.

Although the Commission's Decision disagreed with its examiner in a particular of no importance here, it adopted his findings based on the Automotive Jobbers case and clearly relied on the reach of official notice to make its decision. The Commission itself made even more detailed use of the AJI record, setting forth in several places extended quotations and summaries from testimony given by some five witnesses in the AJI case and adopting the facts appearing therein by "official notice."

It is of some interest to relate the timing of the procedures in this and the Automotive Jobbers case. The complaint against the latter was filed September 21, 1959. Although Dayco could have been joined in that Section 2(f) proceeding, see Automatic Canteen Co. of America v. FTC, 346 U.S. 61, 79, 73 S.Ct. 1017, 97 L.Ed. 1454, 1466 (1953), the Commission, on October 1, 1959, chose

to begin this case as a separate charge of a Section 2(a) violation. Dayco was not notified of the AJI case nor invited to participate. The record here does not disclose when the testimony was taken in the AJI case, but the Initial Decision was filed on October 3, 1961, and was adopted as a matter of course by the Commission on January 4, 1962. Automotive Jobbers, Inc., et al, 60 FTC 19. On February 2, 1962, the Automotive Jobbers, Inc., was voluntarily dissolved. Thereafter, on April 9, 1962, the FTC began the taking of testimony to sustain its case against Dayco. Concededly, the FTC did not carry its burden of proof by this evidence. Thereafter, on May 15, counsel supporting the complaint made the discussed "Motion to Take Official Notice and To Recognize Presumptions." This was granted on June 14, 1962, over the objection of Dayco. Thereafter, Dayco put in testimony by its Dayton counsel relative to correspondence and contacts with the Federal Trade Commission in 1958 seeking to learn what marketing practices were considered illegal, particularly with reference to the so-called buying groups. He stated that he had asked that they "tell us what is verboten," and was told "that those were matters that could not be made public and were not made public, and I learned nothing." Dayco declined to put in any evidence in an attempt to disprove the case the FTC had made against AJI and adduced against Dayco. While it argues here that even accepting the facts of the official notice, a violation by it was not established, Dayco's primary reliance is on the procedural question. We decide the appeal on that issue.

█ We have at length set out the procedures employed by the FTC to "prove" its case against Dayco. We think the question of their validity is answered by the foregoing recitations. However salutary the liberal use of official notice may be as an aid to the Federal Trade Commission and other administrative agencies in the dispatch of their business, due process must be observed in such use. Section 7(d) of the Administrative Procedure Act, 5 U.S.C. § 1006(d), provides that where "any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary." The section, however, attempts no definition of "official notice" and a litigant need not undertake to use his "opportunity to show the contrary" until official notice has been properly employed.

The FTC concedes that no decision heretofore announced is in point.

"There do not appear to be any cases in which courts have explicitly determined whether notice may be taken of facts litigated in prior cases involving other parties, where the parties in the current case contest the facts or the court's action in taking judicial notice." (Opinion of the Commission)

█ In their address to us, the FTC counsel invite us to move official notice to new ground. Recognizing an exception to the hearsay rule by use of prior testimony, "in later trials if there is *an identity of parties,*" it observes that "there is a developing trend to widen the exception," and ask us to adopt a rule which would allow the FTC to make out a case against the first of several accused, and then simply rest upon that case in subsequent proceedings against different parties. We decline to move to the new ground suggested, not out of timidity but because to do so would, in our view, do violence to fair play and due process.

Decided cases and some treatises on the subject provide little guidance and no precise definitions of the permissible reach of official notice. 2 Am.Jur.(2) 192, Administrative Law § 385; 73 C.J.S. Public Administrative Bodies and Procedure § 123, p. 442; Anno. 18 ALR(2) 552; Davis, "Official Notice" 62 Harv. L.Rev. 537. Professor Davis' paper on the subject is an excellent discussion, but is primarily expositive of the difficulties that attend application of the rule to specific cases. We find nothing in it

to support the FTC's contention here. From the Davis paper and other writings and decisions, it may be said the limitations on official notice are not as narrow as those which control judicial notice. Davis distinguishes between "legislative facts" and "adjudicative facts," indicating greater latitude for an agency to find "legislative facts" than "adjudicative facts." From our reading, we glean that "legislative facts" involve generalized factual propositions which could form the basis for a legislative ruling which would have application to some class of situations, while "adjudicative facts" relate to, and are determinative of, one individual situation or course of conduct. However elusive this solution by categories may be in marginal cases, we are confident that the testimonial facts from which the Commission found that Automotive Jobbers was a sham, and such sham was permitting the members of AJI to gain a competitive advantage over others, were unquestionably "adjudicative facts." The critical noticed facts from which the Commission made, also by official notice, its dispositive finding of violation by Automotive Jobbers did not rest upon its "accumulated knowledge" or its experience or expertise, but rather upon the testimony of individual witnesses in a particular prior case. By moving that evidence into the case against Dayco by the implement of official notice, it convicted Dayco of violating the statute. We believe that the most enlightening discussion of the question before us is contained in a recent treatise by Frank E. Cooper, a distinguished practitioner of the Detroit Bar and Professor of Law at the University of Michigan. While his two-volume work bears the title "*State* Administrative Law," his observations are relevant to the entire field of official notice. We find the following dispositive here:

> "It needs no argument to demonstrate that agencies may not take notice of the 'litigation facts' involved in a particular case; to do so would be to shift the burden of proof and make a mock-

ery of the hearing procedure. The doctrine of notice should be limited to facts of a general nature, representing generalizations distilled from repeated demonstrations." Cooper, State Administrative Law, Vol. 1, p. 413.

We need not cite any authority for the proposition that the burden of proof in this case was on the Commission. Its own. rule, 16 C.F.R. § 3.14, provides that, "Counsel supporting the complaint shall have the burden of proof * * *." We think the Administrative Procedure Act, 5 U.S.C. § 1006, must be read as supporting such rule. We are aware that properly employed official notice may assist an agency in meeting its burden. The FTC argues that Dayco could have undertaken to disprove what the FTC had already adjudicated in a case in which it had no part, in which it had no opportunity to cross-examine the witnesses sworn, or otherwise to test the validity of the evidence which moved the FTC to make its decision. Dayco could, says the FTC, examine the record in the AJI case, examine the evidence taken, search out the witnesses sworn and if they were still available and it was thought advisable, bring them in for further cross-examination, even though cross-examination made long after the witnesses' testimony had been given would be of doubtful value. The Automotive Jobbers, Inc., had by the time the FTC took its official notice of its character and internal operations, ceased to exist as a corporation.

The FTC cites as a precedent for its action here its own decision in Manco Watch Strap Co., Inc., 60 FTC 495 (1962). That involved a charge of unfair trade practice arising from the "sale of watch bands not adequately marked in the packaging thereof or otherwise with the country of origin." While there was evidence in the particular case on the point, the Commission appears to have taken official notice of the fact that American consumers generally prefer American made goods and, in the absence of clear markings otherwise, assume that

goods are of domestic origin. Relying upon its relevant knowledge acquired in a long line of cases, the Commission held that it had the right to take official notice of the above habits of the American buyers. It said,

"If this were the first foreign-origin product case to come before the Commission, the conclusion that a substantial segment of the public assumes that unmarked watch bands are American-made and prefers such domestically-made bands would have to be based on specific evidence. But this is not a case of first impression; rather *it follows scores, if not hundreds, of others involving fundamentally the same general factual issues.*" [2] (Emphasis supplied.)

The quoted language at once distinguishes *Manco* from this case, where the basic official notice was taken from the evidence of a single case which did not deal with general accumulated knowledge of buying habits of American people but with the method of operation of one business enterprise, Automotive Jobbers, Inc.

One aspect of the Commission's official notice may have come closer to a matter appropriate for official notice. That was its finding that,

"The automotive parts industry is a highly competitive business involving small margins of profit. Typically automotive parts jobbers realize a net profit after taxes of less than five per cent, and the net prices paid by jobbers is of such importance that they are careful to take advantage of a discount as small as the two per cent cash discount prevalent in the industry, in paying their bills, the failure or inability to take such a discount being of the utmost economic importance to such jobbers' competitive existence."

It cited a large number of cases previously litigated from which it gained the above knowledge. Responsive to Dayco's challenge that the cases relied upon re-

lated to conditions antedating the events involved here, the Commission observed that it had concerned itself with the problems of this industry for a decade, and said "Our investigation and research involving this industry have been continuous and unrelating (sic) over that period." We assume this was to say that it had acquired knowledge independently of litigated cases. A view that the Commission's official notice of general conditions, as last quoted, was permissible will not save the indispensable balance of the official notice from impropriety.

■ Because they are not apposite and provide little help, we shall not extend this opinion by review of the many authorities cited by the opposing counsel in their briefs. To us the procedural impropriety of the Commission's use of official notice as a substitute for proof is plain. It requires vacation of the order finding Dayco guilty of violation of Section 2(a) of the Robinson-Patman Act, vacation of its cease and desist order entered pursuant thereto. It is so ordered.

2) *Price fixing.*

Count II charged Dayco with violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 by attempt to fix the resale price of its products. The Commission sustained the charge.

■■ Prior to 1958 a contract between Dayco and its warehouse wholesaler customers provided that "you will bill your outlets and collect from them. Such charges shall be on Dayton Rubber recommended schedule of charges." Jobbers (known as indirect or "A" jobbers) who purchased from warehouse wholesalers and from jobbers obtaining their merchandise directly from Dayco (known as "AA" jobbers) signed contracts with their sources of supply which provided,

"The jobber agrees to purchase his requirements of Dayton Automotive Products through sources of supply as

---

2. The Manco decision was approved in another watch band case decided by the FTC and affirmed by the D.C.Circuit.

Brite Mfg. Co. v. FTC, 347 F.2d 477, 478 CA D.C., 1965).

designated. In consideration of this agreement, the jobber is entitled to prices in effect for A jobbers at time of shipment."

The trial examiner and the Commission considered that the latter language evidenced the indirect purchasers' (A jobbers) assent to all terms of Dayco's contract with its AA (wholesale) jobbers, and said,

"Considered in this light, respondent, its direct purchasers, and its indirect purchasers have, through this agreement, entered into a conspiracy to fix the price at which the direct purchasers will resell respondent's products to the indirect purchasers."

It was undisputed that after September, 1958, Dayco adopted new forms which eliminated the quoted and objectionable provisions. However, the examiner found that there had been no attempt to renegotiate the old contracts and that some remained in effect. Dayco's sales manager testified that both before and after September, 1958, no attempt was made to enforce any resale prices. We, however, cannot find the Commission's factual conclusions in this regard without substantial support.

Contracts or combinations to fix prices are illegal per se. United States v. McKesson & Robbins, 351 U.S. 305, 308, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 489, 70 S. Ct. 711, 94 L.Ed. 1007 (1950); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Even though the supporting evidence is thin, the FTC found some residual price fixing effect from the early but discontinued forms of agreement. The evidence on this phase of the case was not dependent on any official notice. The Commission's decision in this regard and paragraph 2 of its cease and desist order are affirmed.

This cause is remanded to the Federal Trade Commission for further proceedings consistent with this opinion.