SHREVE EQUIPMENT, INC., Plaintiff-Appellee, Cross-Appellant,

v.

CLAY EQUIPMENT CORPORATION, Defendant-Appellant, Cross-Appellee.

Nos. 79–3217, 79–3218.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1980.

Decided May 18, 1981.

John R. Reilly, Winston & Strawn, John R. Keys, Jr., Washington, D.C., for defendant-appellant, cross-appellee.

Wayne C. Dabb, Jr., Baker, Hostetler & Patterson, Cleveland, Ohio, for plaintiff-appellee, cross-appellant.

Before MARTIN, Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

PHILLIPS, Senior Circuit Judge.

This is a treble damage price discrimination action brought pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, alleging violation of § 2(a) of the Clayton Act as amended by the Robinson-Patman Act. 15 U.S.C. § 13(a).

Clay Equipment Corporation (Clay) is an Iowa manufacturer of farm equipment, selling its products in interstate commerce primarily to independent dealers. Shreve Equipment Inc. (Shreve) is an Ohio corporation engaged in the retail sale of farm equipment in Shreve, Ohio. Shreve sold Clay products as well as equipment produced by other manufacturers.

The president and owner of practically all the capital stock of Shreve, Robert Robinson, was employed by Clay in 1966 as Clay's territorial manager for Northeastern Ohio, and was so employed during the years 1971–73.

Clay granted year-end rebates to its dealers on their purchases of products according to a sliding scale of discounts based upon the cumulative amount of each dealer's purchases of Clay products during the particular discount year. Rebates were not paid to Shreve in 1971–73 and previous years, beginning with the employment of Robinson by Clay. Clay's reason for not allowing rebates to Shreve was that Shreve's president, Robinson, was employed as Clay's territorial manager. The rebate was not paid to Shreve in 1974 because Shreve's account had been past due during that year.

Shreve brought this action alleging that Clay was guilty of price discrimination against it during the years 1971–74, on the ground that Shreve received no year-end discount or rebates from Clay during this period, while rebates were paid and discounts allowed by Clay to its other dealers in competition with Shreve.

The district court held that rebates were denied to Shreve during the years 1971–73 because Shreve's president was employed as territorial manager and this constituted price discrimination resulting in significant competitive injury to Shreve, substantially lessening its ability to compete with other Clay dealers. Judgment was entered in favor of Shreve for actual damages of $14,715 during the years 1971–73, which were trebled to $44,145 pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, plus reasonable attorney's fees. The district court denied

any damages to Shreve for 1974, on the ground that no volume discount or rebate for that year had been allowed by Clay because Shreve's accounts had been past due.

Both Clay and Shreve have appealed. Clay asserts that the district court erred in granting judgment to Shreve for 1971–73, when Shreve's owner-president was Clay's territorial manager. Shreve contends that the district court erred in denying relief in 1974 and for loss of future profits.

We reverse the judgment for the years 1971–73 and affirm the denial of damages for 1974 and all damages claimed under Shreve's cross appeal.

## I

Shreve was an authorized dealer for Clay equipment from its incorporation in 1962 until its dealership was lawfully terminated in 1975.[1] Shreve also sold several other brands of farm equipment. Its sales of Clay equipment comprised about 20 per cent of its total sales during the years in question.

In 1966 Robert Robinson, president of Shreve and its sole shareholder,[2] accepted employment as Clay's territorial manager for all Clay dealers in Northeastern Ohio. Upon Robinson's acceptance of employment with Clay, Clay ceased granting rebates to Shreve which it continued to give to other dealers. This dispute arose from Robinson's employment with Clay while he owned and managed Shreve, and his demand that Shreve also receive the volume discounts despite Clay's stated policy of allowing no discount to Shreve while Robinson was employed with Clay. Shreve contests the denial of the discount only for the period from 1971–74.

Clay's pricing system for its dealers had two main features, the base price and the volume discount plan. The base price for a piece of equipment was the same for all dealers, determined by deducting 30% from Clay's published price list for its equipment. Clay also offered its dealers an additional cash-payment discount of 2% for payments made within ten days.

Clay began offering a volume discount plan to all its dealers in 1964. The amount of the discount was determined by the amount of each dealer's cumulative annual purchases of Clay farm equipment. The discounts were granted according to a sliding scale: the more equipment a dealer purchased during the year, the higher the percentage of discount it received at the end of that year. In actual practice the maximum discount Clay's largest dealers received was approximately 8%. Dealers receiving the discounts accordingly paid lower net prices for each item of farm equipment purchased from Clay during the discount year than they would have paid without the volume discount plan. The exact amount of the discount for each year could not be determined until the end of that year. Thus Clay dealers, when considering the discount in setting retail prices of Clay equipment during the year, at best could estimate the amount they might receive at the end of the year.

The district court found that Shreve competed directly with several Clay dealers who received the year-end volume discounts and rebates. Shreve's primary market area during 1971 through 1974 was found to be within a 50-mile radius of Shreve, Ohio. In addition, Shreve made isolated sales beyond the 50-mile radius. Three Clay dealers were located within Shreve's primary geographic market area and were found to compete directly with Shreve. Three more Clay dealers were located outside Shreve's primary geographic area but were found to have market areas which overlapped with Shreve's.

Each of these dealers sold one or more of the same lines of Clay equipment as sold by Shreve. Each sold Clay equipment on the retail level primarily to farmers. Each pur-

1. The termination of the dealership resulted from a dispute not relevant to the resolution of the issues in this appeal.

2. During oral argument it was stated that Robinson owned all 60 shares of Shreve until 1973, when he gave one share to a Shreve employee.

chased Clay equipment reasonably close in time to Shreve's purchase of numerous items of identical Clay equipment. Each dealer, except Shreve, was eligible for year-end discounts and rebates of varying amounts, depending on total sales for the year.

For the four year period from 1971 through 1974 Shreve was qualified to receive a volume discount on the basis of its sales volume.[3] Based on the testimony of Shreve's economist, the district court found that the denial of the discount to Shreve substantially lessened Shreve's ability to compete with other Clay dealers for sales of Clay farm equipment. Although this finding was fraught with inconsistencies,[4] we shall assume without deciding that the district court's finding of reduced competition was correct. The court found that because of the denial of the discount Shreve had to forego additional purchases of Clay equipment, Shreve lost additional sales, and Shreve lost profits on those additional sales.

## II

In 1966 Robert Robinson, the president, manager, and sole shareholder of Shreve, accepted employment with Clay as its territorial manager. Shortly thereafter a dispute arose between Robinson and Clay over whether Clay had advised Robinson that Shreve would be ineligible for the volume discount while Robinson was employed with Clay. Because of this dispute, Robinson's employment contract with Clay for 1967 added a condition that Robinson's acceptance of employment would prevent Shreve from receiving the volume discount. Robinson voluntarily signed this contract. Although subsequent employment contracts did not contain this prohibition against Shreve's receipt of a discount, the record shows that in the course of dealings between the parties Robinson clearly understood each time he renewed his contract with Clay that Shreve would not receive the discount. Clay stated its reason for this policy was to minimize the incentive of a dealer also acting as a territorial manager to promote his own business at the expense of other competing dealers in the territory.

For Robinson's work as a territorial manager Clay paid him a salary and commissions on all purchases made by all Clay dealers (including Shreve) in his territory, reimbursed his travel expenses, and provided him with a company car. Robinson's rate of commission ranged from 3.5% to 6.0%, depending on the volume of sales in his territory.[5] The record indicates that for 1971 through 1974 the approximate total compensation Clay paid Robinson as territorial manager was $16,000 in salary and $41,000 in commissions.

According to Robinson's own testimony, his duties as Clay's territorial manager and as the owner and manager of Shreve substantially overlapped. In addition to managing Shreve while employed with Clay, Robinson made approximately one-half of

---

3. Shreve had total purchases from Clay for this period in the amount of $356,003.14. Yearly purchases were as follows: 1971—$63,045.85; 1972—$78,442.04; 1973—$74,447.95; 1974—$140,147.30. Based on the volume discount schedule, the estimated discounts Shreve would have received for these years were as follows: 1971—$4,304.58; 1972—$5,844.20; 1973—$5,444.79; 1974—$12,014.73. Shreve's size among Clay dealers on the basis of volume of equipment purchased from Clay was third in 1971, first in 1972, fourth in 1973, and second in 1974.

4. Shreve's economist estimated that if not for the denial of the volume discount, Shreve would have made *additional* purchases of Clay equipment in the amount of $518,858, more than Shreve's actual total purchases from Clay for the same period. The estimated amount of additional sales lost because of the denial of the discount was greater than Shreve's actual total sales of Clay equipment for 1971–74. The estimated percentage of net profit on these lost sales was greater than Shreve's actual net profit percentage for any year of its operation.

5. From 1971 through July, 1973, Robinson's commission was 3.5%, with an additional 2.5%, or a total of 6%, on all volume purchased over $225,000. This 2.5% incentive commission for volume over $225,000 was void if Shreve's volume of purchases exceeded 25% of the total volume produced in the territory. After July, 1973, Robinson received 4% on volume up to $100,000, and 6% on all volume over $100,000, with no limitation on Shreve's volume to obtain the full commission.

all the sales of Clay equipment by Shreve from 1971 through 1974. Robinson, as virtually the sole shareholder, received no salary or compensation from Shreve for his services. Robinson testified that while employed for Clay he also conducted business for Shreve when visiting farmers in his capacity as Clay's territorial manager.

In 1973 Clay agreed to grant the volume discount to Shreve for the 1974 discount year because Robinson's son was to begin managing Shreve and Robinson then would work full-time for Clay. Shreve did not receive the discount in 1974 because of its failure to meet other requirements. Clay had a long-standing policy that a dealer must keep his account with Clay current throughout the relevant discount year in order to receive the discount. The condition was made known and uniformly applied by Clay to all dealers. The district court found that Shreve failed to keep its account with Clay current in the 1974 discount year.

### III

■ A private plaintiff may not recover treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, by proving nothing more than a violation of the antitrust laws. *M. C. Manufacturing Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1063 (5th Cir. 1975), *cert. den.*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Rea v. Ford Motor Co.*, 497 F.2d 577, 589 (3rd Cir.), *cert. den.*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *McAlpine v. AAMCO Automatic Transmissions, Inc.*, 461 F.Supp. 1232, 1264 (E.D.Mich.1978). "It is not enough that the public has been harmed by a violation of the antitrust laws" for a private plaintiff to recover treble damages. *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3rd Cir. 1980). Nor does the fact that a plaintiff has suffered damage alone constitute liability under the antitrust laws. *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283, 287 (6th Cir.) *cert. den.* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *McAlpine, supra*, at 1264. To recover treble damages the plaintiff has the burden of proving a causal connection between the antitrust violation and the damages suffered. Various descriptions of this burden of proof require that the violation be a material cause of the injury, *Comfort Trane Air Conditioning v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979); or that the violation be a substantial factor in the occurrence of damage, *Commerce Tankers v. National Maritime Union of America*, 553 F.2d 793, 801 (2nd Cir.) *cert. den.* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir.) *cert. den.* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973); or that the violation be the proximate cause of the damage, *M. C. Manufacturing Co., supra*, at 1064, *McAlpine, supra*. Although a plaintiff need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be proved as a matter of fact and with a fair degree of certainty. *Comfort Trane Air Conditioning, supra; Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1321 (5th Cir. 1976). "To be one of several causes is not enough." *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 997 (9th Cir. 1979) *cert. den.* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). The evidence linking the violation to the injury sustained must be more precise than that needed to establish the amount of damages. *Van Dyk Research Corp., supra*. Accordingly, in determining whether Shreve may recover treble damages, the focus is not just on whether the volume discount plan violates the Robinson-Patman Act, or whether Shreve or other Clay dealers were injured, but whether the volume discount plan was a Robinson-Patman Act violation which was the proximate or material cause of Shreve's injury.

Where a purchaser does not take advantage of a lower price or a discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or the discrimination is not the proximate cause of the injury. *Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3rd Cir. 1980); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019,

1024–5 (2nd Cir. 1976) *cert. den.* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Tri-Valley Packing Association v. F.T.C.,* 329 F.2d 694, 703–4 (9th Cir. 1964); *Mowery v. Standard Oil Co. of Ohio,* 463 F.Supp. 762, 775–76 n.17 (N.D.Ohio 1976) *aff. without opinion* 590 F.2d 335 (6th Cir. 1978); *World-Wide Volkswagen Corp. v. Autobahn Motors Co.,* 1980–81 Trade Cases ¶ 63,601, p. 77,197 (S.D.N.Y.1980); *Interstate Cigar Co. v. Sterling Drug, Inc.,* 88 F.R.D. 110 (S.D.N.Y.1980); *Rod Baxter Imports v. Saab-Scania of America, Inc.,* 489 F.Supp. 245, 248 n.2 (D.Minn.1980); *Beam v. Monsanto Company, Inc.,* 414 F.Supp. 570, 587 (W.D.Ark. 1976).[6]

■ In the present case, if Shreve had participated in the discount program, its discounts would have been among the largest granted by Clay, and the difference in discount of its nearest competitor insignificant. Shreve's participation in the program would have left it with no injury of which to complain. It was not the existence of the discount program which caused Shreve's alleged injury, but Robinson's choice of an employment relationship with Clay which caused the loss of the discount and Shreve's alleged injury. Although the discounts were available to Shreve, it did not take advantage of the discount program because of the benefits it received from Robinson's employment with Clay.

Shreve argues that Robinson's employment with Clay must be disregarded in considering Shreve's relationship with Clay and its eligibility for the discount. We cannot agree. The evidence is compelling that Robinson profited from his employment with Clay, thereby benefiting Shreve. Robinson was Shreve's sole stockholder, president, manager and main salesman. Shreve paid no salary to Robinson. Robinson's testimony demonstrated the benefits to Shreve from his employment with Clay not only through compensation paid to Robinson, but also through increased business and sales opportunities because of Robinson's overlapping roles. Consideration of Shreve's relationship with Clay is inseparable from Robinson's employment relationship with Clay for purposes of determining whether Shreve could recover antitrust treble damages. *See Bucyrus-Erie Co. v. General Products Corp.,* 643 F.2d 413 (6th Cir. 1981).

We conclude that the district court erred in holding that the discount was unavailable to Shreve because "its availability is premised on burdensome conditions not imposed on all competing buyers," *i. e.,* the condition that Robinson quit Clay's employment. This "burdensome" condition was not imposed on all competing buyers because no other competing dealer was employed as a Clay territorial manager or benefited as Shreve did from Robinson's employment with Clay. Robinson voluntarily assumed this unique relationship with Clay, and during the years in question knew his employment made Shreve ineligible for the discount. Robinson was under no compulsion to renew his employment contracts, and was free to quit Clay's employment anytime after giving 10 days notice. Thus *Fowler Manufacturing Company v. Gorlick,* 415 F.2d 1248 (9th Cir. 1969) *cert. den.* 396 U.S. 1012, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970), relied on by the district court, is inapposite. Fowler rejected the seller's defense that other concessions or adjustments had been made to the buyer to compensate for the price discrimination. *Id.* at 1253–4. In *Fowler,* however, any concessions or adjustments to the buyer as compensation for the price discrimination were controlled exclusively by the seller. Here whether Shreve received the discount or continued to receive the benefits of Robinson's employment with Clay was controlled by Shreve.[7]

---

6. See also ABA Antitrust Section, Monograph No. 4, The Robinson-Patman Act: Policy & Law Vol. I, pp. 107–16 (1980); Kintner, A. Robinson-Patman Primer, pp. 198–200 (1970).

7. The fact that the *Fowler* decision may result in relieving a plaintiff of the need to prove a casual relationship between the price discrimination and the asserted injury has been questioned. *Chrysler Credit Corp. v. J. Truett Payne, Inc.,* 607 F.2d 1133, 1136 (5th Cir. 1980)

Because Robinson voluntarily accepted the employment relationship with Clay, *Perma Life Mufflers, Inc. v. International Parts*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), is also inapplicable. There the plaintiffs had been compelled to accept the onerous terms of a franchise agreement as a condition of doing business with the franchisor. Here Clay did not compel Robinson and Shreve either to accept Robinson's employment with Clay or lose the Clay dealership, nor has Shreve alleged that Clay ever threatened to cancel its dealership agreement if Robinson did not work as Clay's territorial manager. Shreve's options were the benefits of Robinson's employment with Clay or the benefits of the volume discount plan. Its selection of either option had no effect on its retention of the Clay dealership.

Finally *Dayco Corp.*, 66 F.T.C. 451, *rev'd on other grounds* 362 F.2d 180 (6th Cir. 1966), cited by the district court, bears little resemblance to the unique facts of this case. *Dayco* rejected the argument that no price discrimination had occurred where lower prices were available to all "sub-jobbers" if they formed jobber groups. *Dayco* stated that lower prices are unavailable where a purchaser must alter his *purchasing* status before receiving them. In the present case Shreve did not have to alter its independent purchasing status to receive the discount, as was the case in *Dayco*. Clay offered Shreve special advantages through Robinson's employment with Clay which were unavailable to other Clay dealers. Shreve freely and knowingly chose those advantages. Shreve cannot claim now that the discount was unavailable because it had to alter its relationship with Clay and assume the same independent relationship with Clay as all other Clay dealers eligible for the discount. The discount was functionally available to Shreve but it chose not to take advantage of the discount plan. Therefore, the discount plan was not the proximate cause of any alleged injury suffered by Shreve.

Furthermore, when examined in the context of an employment relationship, Clay's condition to Robinson's employment that Shreve would be ineligible for the discount was not an inflexible, undue restraint for which Shreve could recover treble damages. While Robinson was under no compulsion to accept Clay's terms and conditions of employment, the evidence demonstrates that the employment contract and Shreve's eligibility were negotiable and in fact were changed in 1974. For that year Clay agreed to grant Shreve the discount because Robinson's son was to take over the management of Shreve and Robinson was to devote his full time to being a Clay territorial manager. Under these circumstances where a voluntary employment relationship existed with negotiable terms of employment, Shreve may not recover antitrust damages for a condition of Robinson's employment which was accepted without coercion. See *Gross v. University of Tennessee*, 448 F.Supp. 245, 249 (W.D.Tenn. 1978) *aff'd* 620 F.2d 109 (6th Cir. 1980); *Chuy v. Philadelphia Eagles*, 407 F.Supp. 717, 727 (E.D.Penn.1976).

The judgment of the district court granting damages to Shreve for 1971–73 is reversed. The judgment denying damages to Shreve in 1974 and other damages claimed by Shreve in its cross appeal is affirmed. The costs of this appeal are taxed against Shreve Equipment, Inc.

*cert. granted*, —— U.S. ——, 101 S.Ct. 70, 66 L.Ed.2d 20 (1980); *Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243, 273 (E.D.Pa. 1979) *aff'd* 1980–81 Trade Cases ¶ 63,611 (3rd Cir. 1980); Rez, "Causation and Automatic

Damages in Secondary-Line Injury Cases Under § 2(a) of the Robinson-Patman Act: Is *Fowler v. Gorlick* Dead?" 55 Notre Dame L. 660 (1980).