**Pete BOULDIS, et al.,
Plaintiffs-Appellants,**

v.

**U.S. SUZUKI MOTOR CORP., et al.,
Defendants-Appellees.**

No. 82–3277.

United States Court of Appeals,
Sixth Circuit.

Argued April 20, 1983.

Decided June 27, 1983.

Larry A. Zink (argued), Zink, Zink & Zink Co., L.P.A., Canton, Ohio, for plaintiffs-appellants.

Robert B. Gosline, Shumaker, Loop & Kendrick, Robert G. Clayton, Jr., David W. Wicklund (argued), Toledo, Ohio, for defendants-appellees.

Before EDWARDS, Chief Judge, ENGEL, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

Plaintiff, Bold-Morr, Inc. a former Suzuki motorcycle dealership, appeals a summary judgment dismissing its claim that defendants, U.S. Suzuki Motor Corporation and Daryl Lucian, a district sales manager for Suzuki, had committed a number of violations under the federal antitrust laws. The other plaintiffs, Pete Bouldis and Norman Morris, are officers and sole stockholders of Bold-Morr. In its complaint Bold-Morr sought treble damages, alleging that cer-

tain of Suzuki's business policies and practices violated § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), (d) & (e) (price discrimination), § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (tying arrangements), and § 3 of the Clayton Act, 15 U.S.C. § 14 (tying arrangements).

The parties engaged in extensive discovery, including interrogatories, requests for documents and depositions. Suzuki then filed a motion for summary judgment. On March 11, 1982, District Judge Nicholas J. Walinski entered a comprehensive 40 page opinion and granted Suzuki's summary judgment motion. While noting that summary procedures should be used "sparingly" in such cases, Judge Walinski concluded that summary judgment was appropriate in the present action because the evidence did not establish any factual basis upon which the asserted antitrust violations could be premised.

On appeal Bold-Morr contends that it was error for the district court to grant summary judgment. We affirm.

## I

Bold-Morr was incorporated in 1972. During the years 1972–75, it operated as a Mazda automobile dealership. Due to substantial losses sustained by Bold-Morr, this venture was terminated. After the demise of the Mazda automobile dealership, appellants contacted the U.S. Suzuki representative serving the Canton, Ohio, area to inquire about obtaining a Suzuki motorcycle dealership. Subsequently, Bold-Morr acquired a motorcycle dealership, when the only other Suzuki dealer in the Canton area left the business.

Pursuant to a written Dealer Agreement, dated January 28, 1975, Bold-Morr acquired an exclusive motorcycle dealership location, and Suzuki agreed not to locate another dealer within Bold-Morr's area. In commencing its dealership, Bold-Morr was permitted to obtain the former dealer's inventory on "pay as sold" terms.[1] Also, Suzuki authorized Bold-Morr to purchase new models on a pay as sold and prepaid freight basis.[2] Additionally, to increase its inventory, Bold-Morr purchased several models under an initial floor plan line of credit through the Borg Warner Corporation.[3] Subsequently, in March 1975, Bold-Morr arranged its floor plan line of credit through the Harter Bank and Trust Company of Canton, Ohio. The Harter Bank extended a $125,000 line of credit to Bold-Morr.

During the years 1975–76, Bold-Morr experienced some difficulties in making prompt payment for models procured under the pay as sold program and for parts it had ordered. Because of financial problems, in November 1975, Bold-Morr applied for an additional line of credit through the Suzuki Finance Program.[4] Due to its precarious

---

1. Pay as sold terms constitute a form of credit offered to qualified dealers by Suzuki. Under this plan, when a dealer purchases a certain quantity of promoted motorcycles, he does not have to pay for them immediately, but at a designated due date in the future. If all units purchased on these terms have been sold by the dealer and the dealer's price for each unit has been paid to Suzuki before the due date, then nothing is due and owing to Suzuki. However, any units that remain unsold as of the due date must be paid for on the due date. The advantage of obtaining motorcycles on pay as sold terms is that a dealer's interest charges incurred on normal floor plan financing are avoided.

2. Under the Dealer Agreement the dealer was required to pay for all transportation charges in the shipment of motorcycles from the Suzuki facility. However, under several promotional offers made by Suzuki, a dealer could qualify to receive the promoted motorcycles with Suzuki paying the freight cost.

3. Suzuki required dealers to pay for motorcycles when the orders were submitted to Suzuki or upon delivery by cash or sight draft. However, if the dealer had a floor plan line of credit with a financial institution, and proper arrangements made, Suzuki would bill the lending institution. In this instance, payment was due upon receipt of the invoice for the order. Thus, with respect to Bold-Morr, Suzuki would bill Borg-Warner and then when Bold-Morr changed its floor plan financing to the Harter Bank, it would bill the bank.

4. The Suzuki finance program was devised for floor plan financing of motorcycles. If a dealer was credit qualified, as determined by Suzuki's Credit Department, he could use this financing in lieu of other arrangements or as a supplement to existing financing.

financial posture, Bold-Morr was not approved for this additional funding. Consequently, as Bold-Morr's financial woes increased, so did its inability to participate in several promotional programs offered by Suzuki.

In May 1976, the Harter Bank terminated Bold-Morr's floor plan line of credit, when the dealership was unable to pay the principal and interest on its capital loans. Efforts by appellants to obtain alternative financing or to sell the dealership proved unsuccessful. Inability to purchase new models, maintain inventory and conduct an effective advertising campaign marked the quick and ultimate demise of the dealership. In December 1976, the Harter Bank repossessed Bold-Morr's entire inventory and, in turn, appellants terminated the Suzuki dealership.

In an effort to recover losses, appellants filed suit against Suzuki alleging violations of federal antitrust laws. In attacking the propriety of summary judgment, Bold-Morr asserts that Suzuki's promotional programs and business policies constituted forms of price discrimination in violation of the Robinson-Patman Act. Additionally, it is contended that certain arrangements between the parties culminated in a series of tying agreements in violation of both the Sherman Antitrust Act and the Clayton Act.

## II

It is a well established rule that motions for summary judgment are disfavored in antitrust litigation and that the standard for granting summary judgment is strict. *See First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 284–90, 88 S.Ct. 1575, 1590–93, 20 L.Ed.2d 569, *reh'g denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 947 (6th Cir.1983); *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1197 (6th Cir.1982); *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.,* 560 F.2d 211, 213 (6th Cir.1977). However, this general rule does not preclude the use of summary judgment in appropriate antitrust litiga-

tion. *See First National Bank of Arizona, supra,* 391 U.S. at 288–90, 88 S.Ct. at 1592–93; *Smith, supra,* 703 F.2d at 947–48; *Davis-Watkins Co. supra,* 686 F.2d at 1197; *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1166–67 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). *See also* Fed.R.Civ.P. 56 advisory committee note (1982) (summary judgment is "applicable to all actions"). Indeed, the very purpose of a motion for summary judgment, to eliminate a trial where it would be unnecessary and merely result in delay and expense, warrants summary disposition of such cases when appropriate.

■ In ruling on a motion for summary judgment, the evidence must be viewed in a light most favorable to the party opposing the motion. That party must be given the benefit of all reasonable inferences. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 158–59, 90 S.Ct. 1598, 1608, 1609, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Davis-Watkins Co., supra,* 686 F.2d at 1197. However, when a motion for summary judgment is made and supported, the opposing party may not rest on its pleadings, but must present sufficient evidence supporting its claims to demonstrate that there is a genuine issue of material fact. *See Adickes, supra,* 398 U.S. at 159 & n. 19, 90 S.Ct. at 1609 & n. 19; *First National Bank of Arizona, supra,* 391 U.S. at 288, 88 S.Ct. at 1592; *Smith, supra,* 703 F.2d at 947–48. *See also* Fed.R.Civ.P. 56(e). If the record evidence is not disputed as to any material fact, the case should be decided as a matter of law rather than submitted to a jury. *Davis-Watkins Co., supra,* 686 F.2d at 1197; *Smith v. Hudson,* 600 F.2d 60, 64–65 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Accordingly, "the absence of any relevant probative evidence in support of a litigant's antitrust claims will expose such claims to summary judgment disposition." *Davis-Watkins Co., supra,* 686 F.2d at 1197. *See First National Bank of Arizona, supra,* 391 U.S. at 290, 88 S.Ct. at 1593; *Smith v. Northern Medical Hospitals, Inc., supra,* 703 F.2d at 947–48.

Upon review of the record, we conclude that Bold-Morr has failed to submit any relevant evidence which would provide a sufficient factual basis to withstand summary judgment as to any of the asserted grounds for relief. The antitrust claims in the instant action raise only questions of law. Therefore, we conclude that disposition by summary judgment was proper under the circumstances of this case.

### III

Bold-Morr contends that the district court erred in dismissing its claim of price discrimination under § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act.[5] Essentially, this section makes it unlawful for a seller to discriminate in price between purchasers of the same or similar goods actually sold, whether to the ultimate purchaser or for resale, if the effect of such price discrimination may be to lessen competition substantially in a line of commerce or with the competitors of the seller or its customers. *See Federal Trade Comm. v. Anheuser-Busch, Inc.,* 363 U.S. 536, 547–51, 80 S.Ct. 1267, 1273–75, 4 L.Ed.2d 1385 (1969) (the term "price discrimination" is defined as merely a difference in price). Bold-Morr asserts two arguments to support its claim. First, it is charged that Suzuki initiated and maintained credit programs to enable dealers to purchase Suzuki products, and that Bold-Morr was not permitted to participate in these programs. Bold-Morr asserts that, as a result, its actual cost for motorcycles was greater than that of other Suzuki dealers who were approved for these credit programs. Two programs are cited by Bold-Morr in support of this contention: the "pay as sold" and the Suzuki finance programs.

Both the pay as sold program and the Suzuki finance program were initiated to afford credit to qualified dealers. Suzuki maintains that participation in its credit program is contingent upon a dealer's overall credit worthiness, and, therefore, credit decisions are based upon legitimate business factors. Suzuki presented evidence that its adverse credit decisions with respect to Bold-Morr were based upon Bold-Morr's poor financial condition.

Section 2(a) is not violated when the credit decisions are based upon legitimate business reasons. *See, e.g., Craig v. Sun Oil Company of Pennsylvania,* 515 F.2d 221, 224 (10th Cir.1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976). As noted by the Tenth Circuit, decisions involving the extension of credit do not, as a matter of law, constitute a Robinson-Patman violation, since "differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, and other devices used by creditors under [such] circumstances." *Craig, supra,* 515 F.2d at 224.

The record shows that Suzuki demonstrated the existence and application of business factors in making its credit decisions. To be eligible under the pay as sold program the dealer was required to meet the following requirements: satisfactory credit history with Suzuki; signing a continuing guaranty; signing a security agreement; obtaining sufficient insurance coverage; and providing a current financial statement. The record also reflects factors used by Suzuki in evaluating the dealer's credit worthiness, such as: the dealer's credit history, net worth, capital, cash position, personal guaranty and success of the

---

**5.** 15 U.S.C. § 13(a) provides, in part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

dealership. Such financial factors also were used by Suzuki's credit department in determining whether a dealer was eligible for a line of credit under the Suzuki finance program.

Application of these factors to Bold-Morr's financial position reveals a prudent credit decision by Suzuki. Bold-Morr had a history of late payments for parts ordered and for the models it procured under pay as sold terms. When Bold-Morr acquired the dealership, it had a loss carryover of approximately $44,000 from prior years as a Mazda dealer. In addition, Bold-Morr had liabilities considerably exceeding ·its net worth.

These facts demonstrate that Suzuki's credit decisions with respect to Bold-Morr were based upon legitimate business factors. Bold-Morr has failed to submit any probative evidence which would suggest that Suzuki's credit decisions were based upon any other factors or motive. We reemphasize that under Fed.R.Civ.P. 56(e), Bold-Morr may not rest upon mere allegations but must set forth specific facts showing that there is a genuine issue of material fact for trial. *See First National Bank of Arizona, supra,* 391 U.S. at 288–90, 88 S.Ct. at 1592–93. Since a decision to extend or withhold credit which is based upon valid business considerations does not violate § 2(a), and since the only record evidence establishes that Suzuki's refusal to extend credit to Bold-Morr under either program was based upon valid considerations, it was not error for the district court to grant summary judgment on this issue.

Bold-Morr's second price discrimination argument is that Suzuki's incentive programs, which offered to dealers various rebates, inventory adjustments, freight and other allowances, were not practically or functionally available to it, in violation of § 2(a) of the Clayton Act, as amended. The crux of Bold-Morr's claim is that Suzuki conditioned the various price concessions and allowances on the purchase of specific quantities and makes of motorcycles, and, as such, these promotional programs were only available to large dealers and not dealers of average size, thereby giving the large volume dealer a competitive advantage.

■ The practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson-Patman violation if the concessions are available equally and functionally to all customers. *See Federal Trade Comm. v. Morton Salt Co.,* 334 U.S. 37, 42, 68 S.Ct. 822, 826, 92 L.Ed. 1196 (1948); *Shreve Equipment, Inc. v. Clay Equipment Corp.,* 650 F.2d 101, 105 (6th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981); *Mowrey v. Standard Oil Company of Ohio,* 463 F.Supp. 762, 775–76 n. 17 (N.D.Ohio 1976), *aff'd without opinion,* 590 F.2d 335 (6th Cir.1978). *See generally* 16C Von Kalinowski, BUSINESS ORGANIZATIONS § 27.04 (1982). Further, a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available. *See Shreve Equipment, Inc., supra,* 650 F.2d at 105. The legislative history reveals that the aim of the Act is to prevent a large buyer from gaining discriminatory preferences over the small buyer solely because of the large buyer's greater purchasing power. *See Federal Trade Comm. v. Henry Broch & Co.,* 363 U.S. 166, 168–69, 80 S.Ct. 1158, 1160–61, 4 L.Ed.2d 1124 (1960); *Morton Salt Co., supra,* 334 U.S. at 43, 68 S.Ct. at 826.

In granting summary judgment on this claim, the district court found that the various concessions and allowances made available by Suzuki's promotional programs were practically and realistically available to Bold-Morr. We agree. A review of the record demonstrates that the purchasing conditions imposed were well within the means of the average Suzuki dealer.

Bold-Morr had a comparable floor plan ($125,000) with that of other area Suzuki dealers. The imposed purchasing conditions, although varying with each promotional package, did not require large-scale outlays; rather, the purchase requirements involved with most of Suzuki's promotions required the purchase of four to eight units, an outlay of less than $10,000. The record shows that Bold-Morr participated in the

largest promotional program, the "Super Deal," which required the purchase of at least 30 units.

It is also important to note that the promotional packages were intended to enhance the sale of products to dealers by providing economic incentives to purchase the promoted models. Moreover, Suzuki did not expect a dealer to participate in every promotional program. It was a matter of discretion with each dealer, in the exercise of its business judgment, whether to take advantage of the promotion. Appellant Pete Bouldis testified that on some occasions he participated in the promotional programs and at other times he did not, despite the fact that he had the financial ability to do so. Bouldis testified that he had cash flow and inventory problems which prevented him, at times, from participating in the promotional sales. Accordingly, by appellant's own admission, there is no causal link between Suzuki's practices and appellant's alleged injuries. *See generally* 16C Von Kalinowski, *supra,* at § 31.01[5][c].

Accordingly, we conclude that Suzuki's promotional programs were equally and functionally available to Bold-Morr, and, therefore, § 2(a) of the Clayton Act, as amended, was not violated.

### IV

■ Bold-Morr contends that the district court erred in finding that Suzuki's practice of extending credit, granting freight allowances, services and return privileges did not violate §§ 2(d) & 2(e) of the Clayton Act, as amended.

Section 2(d) prohibits a seller from making payments to one customer for services

or facilities furnished by the customer, unless such payments are available to all purchasers on an equally proportional basis.[6] *See Federal Trade Comm. v. Fred Meyer, Inc.,* 390 U.S. 341, 350–53, 88 S.Ct. 904, 909–10, 19 L.Ed.2d 1222 (1968); *Federal Trade Comm. v. Simplicity Pattern Co., Inc.,* 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 *reh'g denied,* 361 U.S. 855, 80 S.Ct. 41, 4 L.Ed.2d 93 (1959); *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 881 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983); *Vanity Fair Paper Mills, Inc. v. Federal Trade Comm.,* 311 F.2d 480, 486–87 (2d Cir.1962); *Exquisite Form Brassiere, Inc. v. Federal Trade Comm.,* 301 F.2d 499, 500 (D.C.Cir. 1961), *cert. denied,* 369 U.S. 888, 82 S.Ct. 1162, 8 L.Ed.2d 289 (1962). On the other hand, § 2(e) prohibits the seller from furnishing services or facilities connected with the process and handling of commodities upon all terms not accorded to all purchasers on a proportionally equal basis.[7] *See Simplicity Pattern Co., supra,* 360 U.S. at 65, 79 S.Ct. at 1011; *Zoslaw, supra,* 693 F.2d at 881; *Exquisite Form Brassiere, Inc., supra,* 301 F.2d at 500. *See generally* E. Kinter, A ROBINSON-PATMAN PRIMER 30–34, 245–47 (1970); 16D Von Kalinowski, *supra,* at § 34.02.

■ The aim of both sections is to eliminate devices by which preferred buyers obtain discriminatory preferences under the guise of promotional allowances. *See Fred Meyer, Inc., supra,* 390 U.S. at 349–50, 88 S.Ct. at 908–09; *Henry Broch & Co., supra,* 363 U.S. at 168, 80 S.Ct. at 1160. However, it is important to note that the discriminatory practices made unlawful by §§ 2(d) &

---

**6.** 15 U.S.C. § 13(d) provides:

It shall be unlawful for any person engaged in commerce to pay or contact for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers compet-

ing in the distribution of such products or commodities.

**7.** 15 U.S.C. § 13(e) provides:

It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

2(e) must occur in connection with commodities obtained by the purchaser for *resale*. *See Fred Meyer, Inc., supra,* 390 U.S. at 355–57, 88 S.Ct. at 911–12; *L & L Oil Co., Inc. v. Murphy Oil Corp.,* 674 F.2d 1113, 1119 (5th Cir.1982); *Purdy Mobile Homes, Inc. v. Champion Home Builders Co.,* 594 F.2d 1313, 1317 (9th Cir.1979).

■ Bold-Morr first claims that Suzuki's credit programs (pay as sold and Suzuki finance) violated §§ 2(d) & 2(e), as such programs were only available to certain favored customers. This claim is without merit because discriminatory practices in the extension of credit from the seller to the buyer are beyond the scope of either § 2(d) or § 2(e). *See, e.g., Murphy Oil Corp., supra,* 674 F.2d at 1119 & n. 7; *Skinner v. United States Steel Corp.,* 233 F.2d 762, 765 (5th Cir.1956). Accordingly, the extension of credit is a practice incident to the original sale rather than to the subsequent resale of the product, and, therefore, outside the coverage of §§ 2(d) & 2(e). *See* 16C Von Kalinowski, *supra,* at § 27.05; Annotation, "Validity, construction, and application of §§ 2(d) and 2(e) of the Robinson-Patman Act, regarding discriminatory payment for or furnishing of services or facilities," 24 A.L.R.Fed. 9, 81–83 (1975).

■ Bold-Morr also argues that Suzuki's freight allowances (prepaid freight promotions), conditioned upon the purchase of a specific number of motorcycles, violated §§ 2(d) & 2(e). This claim also lacks merit, since freight allowances relate merely to the initial sale of the product and not its resale. Therefore, freight allowances fall outside the coverage of both § 2(d) and § 2(e). *See, e.g., Centex-Winston Corp. v. Edward Hines Lumber Co.,* 447 F.2d 585, 588 n. 5 (7th Cir.1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972); *Chicago Spring Products Co. v. United States Steel Corp.,* 254 F.Supp. 83, 84–85 (N.D.Ill.1966), *aff'd per curiam,* 371 F.2d 428 (7th Cir.1966); 16C Von Kalinowski, *supra,* at § 27.05.

■ It is also asserted that Suzuki violated §§ 2(d) & 2(e) by refusing to accept merchandise returns from Bold-Morr, while accepting returns from other dealers. Under the Dealer Agreement between the parties, Suzuki merely had the "option" to repurchase a dealer's models and inventory. Nonetheless, the record demonstrates that Suzuki did repurchase from the Harter Bank all of Bold-Morr's floor plan financed units. In addition, Suzuki exercised its repurchase option with respect to all the units Bold-Morr acquired under pay as sold terms.

It has been held that a seller who permits certain of its customers to return unsold goods for credit, while not extending the same privilege to other customers violates § 2(e). *See, e.g., Joseph A. Kaplan & Sons, Inc. v. Federal Trade Comm.,* 347 F.2d 785, 787–88 (D.C.Cir.1965); *Students Book Co. v. Washington Law Book Co.,* 232 F.2d 49, 50 (D.C.Cir.1955), *cert. denied,* 350 U.S. 988, 76 S.Ct. 474, 100 L.Ed. 854 (1956). However, it is also required that the return privilege be connected with the resale of the product to trigger the application of § 2(e). *See Fred Meyer, Inc., supra,* 390 U.S. at 349, 88 S.Ct. at 908. In the present case, Bold-Morr's dealership was terminated by the time the repurchase option became effective, and, therefore, Bold-Morr no longer was engaged in the ongoing business of selling motorcycles. Clearly, this situation is unlike one where return privileges are denied to an ongoing and viable business enterprise. Accordingly, with the dealership terminated, the failure of Suzuki to exercise its repurchase option with respect to portions of Bold-Morr's inventory, had no relation to the resale of the goods as required by § 2(e).

■ The final claim under §§ 2(d) & 2(e) is that advertising monies, termed co-op funds, were made available to other dealers which were not practically available to Bold-Morr.[8] There is no dispute that

---

8. Co-op advertising is a program employed by Suzuki to supplement a dealer's local advertising. Co-op funds are generated by the purchase of motorcycles. Specified dollar amounts for each model of motorcycles purchased by the dealer are credited to the dealer's co-op advertising fund. The dollar amounts

these advertising allowances fall within the scope of § 2(d), and, thus, Suzuki was required to make the allowances available on proportionally equal terms to all of its customers. *See Simplicity Pattern Co., supra,* 360 U.S. at 65, 79 S.Ct. at 1011; *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 209 (3d Cir.1980).

■ Generally, to assure proportionality, the seller is free to devise any particular method, so long as the system utilized does not discriminate in favor of the large volume buyer. The Federal Trade Commission has stated that the best way to assure fairness in advertising allowances is to base the payments "on the dollar volume or on the quantity of goods purchased during a specified period." FTC Guides for Advertising Allowances and other Merchandising Payments and Services, 16 C.F.R. § 240.7 (1982). *See* 16D Von Kalinowski, *supra,* at § 35.04.

■ The record shows that Suzuki based the allocation of co-op advertising funds according to the number of motorcycles purchased by a dealer. Under this plan, a certain dollar amount for each model purchased by the dealer would be credited to the dealer's co-op advertising fund. The record further demonstrates that Suzuki's promotional programs which offered allowances for advertising, involved modest requirements to assure that the co-op funds were available to all dealers on a proportionately equal basis. Therefore, since Suzuki allocated its advertising allowances pursuant to a plan acceptable to the Federal Trade Commission, we conclude that it

was appropriate to grant summary judgment on this issue as well. *See Fred Meyer, supra,* 390 U.S. at 358, 88 S.Ct. at 913 (payment of promotional allowance is not barred so long as the supplier takes responsibility under the rules and guidelines promulgated by the Federal Trade Commission).

## V

Bold-Morr's final claim on appeal is that Suzuki imposed a number of unlawful tying agreements, violating both § 1 of the Sherman Antitrust Act[9] and § 3 of the Clayton Act.[10]

■ A tying agreement exists when a seller, having a product which buyers want (the "tying product"), refuses to sell it alone and insists that any buyer who wants it must also purchase another product (the "tied product"). *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958); *Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123, 1126 (6th Cir.1981). The "essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 881, 97 L.Ed. 1277 (1953). Thus, tying arrangements are per se unlawful under § 1 of the Sherman Act, § 3 of the Clayton Act, or both, "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for

vary from time to time and from model to model.

**9.** 15 U.S.C. § 1 provides, in part:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**10.** 15 U.S.C. § 14 provides:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consump-

tion, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Fortner Enterprises, Inc. v. United States Steel Corp., (Fortner I )* 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969), quoting *Northern Pacific Ry. Co., supra,* 356 U.S. at 6, 78 S.Ct. at 518.

■ Under § 1 of the Sherman Act, a tying arrangement is per se illegal if the following three elements are presented:

1) There must be a tying arrangement between two distinct products or services;

2) The seller must have sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and

3) The amount of commerce affecting must be "not insubstantial."

*Fortner I, supra,* 394 U.S. at 499, 89 S.Ct. at 1256; *Northern Pacific Ry. Co., supra,* 356 U.S. at 6, 78 S.Ct. at 518; *Bell, supra,* 660 F.2d at 1127. Additionally, § 3 of the Clayton Act is violated if the tying arrangement involves goods, wares, merchandise or other commodities. *See generally* 16B Von Kalinowski, *supra,* at § 12.04[1].

### A.

■ The first alleged tying arrangement involves freight allowances. Normally, the dealer was obligated to pay all freight charges in the shipment of motorcycles. However, under various promotions offered, Suzuki agreed to prepay the freight charges if the dealer purchased a specific quantity of motorcycles. Bold-Morr avers that this practice constituted an unlawful tying arrangement, with the tying product being motorcycles and prepaid freight as the tied product.

Such an allegation cannot withstand analysis. Bold-Morr was never compelled to participate in these programs to obtain the tying product. Unlike the common scheme found in tying arrangements, it was to Bold-Morr's advantage to participate in the promotional programs, as it would shift the expense for freight services from Bold-Morr to Suzuki. Additionally, Suzuki did not offer to provide freight services, but, rather, it only offered to absorb the cost for

such services. Thus, this situation is distinguishable from those cases relied upon by Bold-Morr in which buyers were required to pay for freight service supplied by the seller in order to procure the tying product. *See, e.g., Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc.,* 475 F.Supp. 973, 981–86 (D.Mass.1979). Lastly, under the circumstances presented, it appears doubtful that freight allowances could be considered a "separate product" for purposes of § 1, as the allowances appear to constitute an inseparable part of the purchase price for the tying product. *Cf. Fortner I, supra,* 394 U.S. at 507, 89 S.Ct. at 1260 (credit may constitute an inseparable part of the purchase price for the item so that the entire transaction could be considered to involve only one product); *Foster v. Maryland State Savings and Loan Association,* 590 F.2d 928, 931–33 (D.C.Cir.1978), cert. denied, 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979) (fee for legal services are not a separate product but incidental to purchase of residential property loan).

Therefore, we conclude that the offered freight allowances did not violate § 1 of the Sherman Act. It is also clear that the allowances did not violate the Clayton Act, since freight allowances do not constitute a commodity triggering the application of § 3.

### B.

■ Bold-Morr argues that rebates offered by Suzuki, conditioned upon the purchase of a number of models, constituted a tying arrangement. Under this theory, motorcycles represent the tying product and rebates are the tied product.

This contention, too, is without merit. A rebate is a retroactive price discount or adjustment given by the seller to induce the sale of a particular product. It is neither a service nor a product for which a separate market exists. Therefore, such a claim cannot be sustained under the Sherman Act or Clayton Act.

### C.

■ Another alleged tying arrangement involves various package deals offered by

Suzuki to its dealers. Such deals involved the conditioning of free motorcycles, freight allowances, advertising materials and co-op funds, upon the dealer's purchase of a number of motorcycles. Thus, Bold-Morr contends that the tied product is motorcycles and that the various items and price discounts constitute the tying products.

As noted, above, the price concessions under these circumstances are so related to the principal product that it is difficult to conclude that two separate products exist. On the other hand, it is arguable that some of the advertising materials—spec sheets and displays—do constitute separate products, and, therefore, the potential for a tying arrangement is present. However, Bold-Morr is unable to prevail on this claim, since the record clearly demonstrates that the various advertising materials could be purchased freely by any dealer. Accordingly, since these items could be obtained without purchasing the tied product, no tying arrangement could exist. *See Northern Pacific Ry. Co., supra,* 356 U.S. at 6 n. 4, 78 S.Ct. at 518 n. 4.

### D.

The final alleged tying arrangement claimed by Bold-Morr is that the pay as sold terms and participation in the Suzuki finance program were conditioned upon Bold-Morr purchasing certain models and quantities of motorcycles. Although this allegation seemingly makes motorcycles the tied product and credit as the tying product, Bold-Morr, in response to Interrogatory # 85, stated that the tying products are motorcycles and credit represents the tied product.

Assuming that credit is the tied product, there is no way a tying arrangement could exist, as Bold-Morr would have to show that in order to purchase the tying product it was required to obtain credit from Suzuki. However, it is clear from the record that Suzuki did not condition the purchase of motorcycles on Bold-Morr's participation in the credit programs. Rather, it is evident that motorcycles could be purchased for cash, by credit from an outside lender, or pursuant to Suzuki's promotional or credit programs.

Even if the arrangement is considered in the alternative (i.e., credit as the tying product and motorcycles as the tied products) a tying arrangement cannot be found. Under this analysis the focus, once again, is whether two separate and distinct products exist. Under the circumstance of this case, we are convinced that the extension of credit by Suzuki to its dealers was such an inseparable part of the purchase price for the motorcycles that the transaction involved only a single product. *Cf. Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580, *reh'g denied,* 448 U.S. 911, 101 S.Ct. 26, 65 L.Ed.2d 1172 (1980) (credit terms must be characterized as an inseparable part of the price); *United States Steel Corp. v. Fortner Enterprises, Inc., (Fortner II)* 429 U.S. 610, 622–23, 97 S.Ct. 861, 868–69, 51 L.Ed.2d 80 (1976) (Burger, C.J., concurring) (*Fortner I* should not be read to cast doubt on the legality of credit financing by manufacturers or distributors); *Fortner I, supra,* 394 U.S. at 507, 89 S.Ct. at 1260 ("In the usual sale on credit the seller, a single individual or corporation, simply makes an agreement determining when and how much he will be paid for his product. In such a sale the credit may constitute such an inseparable part of the purchase price for the item that the entire transaction could be considered to involve only a single product."). Therefore, we conclude that no tying arrangement existed under the Sherman Act with respect to Suzuki's credit programs. It is also clear that the Clayton Act is inapplicable under this claim, as credit is a service and not a commodity.

In summary, appellants fell victim to the economy and poor financial management. The record discloses no real issues of fact which would be appropriate for a full scale trial. Appellants have shown no issues of material fact requiring a remand for trial. Accordingly, we conclude that the district court did not err in granting Suzuki's motion for summary judgment.

Affirmed. The costs of this appeal are taxed against appellant.