*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

FREIGHTLINER OF KNOXVILLE, INC.; CARROLL
PROPERTIES, L.P.; and BUDDIE E. CARROLL,
                            *Plaintiffs-Appellants,*

    *v.*

DAIMLERCHRYSLER VANS, LLC,
                            *Defendant-Appellee,*

FREIGHTLINER, LLC,

                            *Defendant.*

No. 06-6054

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00339—Thomas Varlan, District Judge.

Submitted: April 19, 2007

Decided and Filed: April 26, 2007

Before: MERRITT and MARTIN, Circuit Judges; FORESTER, District Judge.[*]

─────────────────

## COUNSEL

**ON BRIEF:** Robert S. Stone, Jr., Katherine M. Hamilton, YOUNG, WILLIAMS, KIRK & STONE, Knoxville, Tennessee, for Appellants. George W. Mykulak, Boston, Massachusetts, for Appellee.

─────────────────

## OPINION

─────────────────

    BOYCE F. MARTIN, JR., Circuit Judge. Plaintiffs appeal from the district court's dismissal of their claims under Fed. R. Civ. P. 12(b)(6). For the reasons outlined below, we **AFFIRM** in part and **REVERSE** in part.

─────────────────

[*]The Honorable Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

I

Plaintiff-Appellant Freightliner of Knoxville, Inc. ("FOK") is a Tennessee corporation authorized to sell and service the Freightliner brand of medium- and heavy-duty trucks. Plaintiff-Appellant Carroll Properties, L.P. is a Tennessee partnership that built and leased the FOK facility to Plaintiff-Appellant Buddie E. Carroll. Carroll, a Tennessee resident who is the sole shareholder of FOK and its president, then leased the facility to FOK.

Defendant-Appellee DaimlerChrysler Vans, LLC ("DC Vans") is a Delaware company wholly owned by DaimlerChrysler, AG. DC Vans distributes a line of commercial vans known as the "Sprinter." Defendant Freightliner, LLC ("FLLC") is a Delaware company also wholly owned by the parent DaimlerChrysler, AG. FLLC manufactures vehicles marketed under the Freightliner brand.

FOK alleges that in February 2000, the president of FLLC presented it and a select group of Freightliner dealers with the opportunity to sell what was to be called the "Freightliner Sprinter," a medium-size commercial van which could also be customized for passengers. Although it was to be marketed in the United States under the Freightliner brand, the Sprinter was virtually identical to a van that had been sold in Europe for many years, with tremendous success, under the Mercedes-Benz brand. FOK believed that if it became a Freightliner Sprinter franchisee, "it would be able to sell a great deal of product for a long time."

The catch, according to FOK, was that a dealer would only be selected to sell the Sprinter if it were to upgrade its facility in a variety of ways, including (among other things): creation of a separate showroom for Sprinter vans, so as to "segregate potential Sprinter corporate customers from heavy-duty truck customers who frequent every Freightliner dealership for sales and service." FOK took the bait and accordingly changed the design plans for its planned Knoxville facility by adding designated space for the Sprinter vans. FOK estimates that it paid $800,000 in "additional construction costs" in order to build the new space. FOK was rewarded for its efforts: sometime after May 2001 FLLC notified FOK that it had been approved for a Sprinter retail sales and service agreement. At the same time, FLLC told FOK that DC Vans, and not FLLC, would be the distributor of the Sprinter vans. This appears to have been a mere hiccup in the negotiations, however, as on September 26, 2001, FOK entered into a dealer agreement with DC Vans for the sale of Sprinters.

FOK alleges that regardless of who its distributor was (FLLC or DC Vans), it had always operated under the unwritten assumption that the Sprinter vans would be distributed exclusively to *Freightliner* dealers (such as FOK), and sold exclusively under the *Freightliner* brand. As FOK states in its amended complaint, "DC Vans stepped seamlessly into the shoes of FLLC. It parroted and confirmed the distinct impression of exclusivity fostered by FLLC's representations." This assumption proved mistaken, however: sometime in 2002, FOK was informed that the Sprinter van would also be sold through *Dodge* dealers under the *Dodge* brand, i.e., as a "*Dodge* Sprinter."[1] To add insult to injury, on July 19, 2002, FOK was informed that not only would the Sprinter be concomitantly sold as a Dodge product, but also that Freightliner dealers would only be permitted to sell Sprinter vans until 2005, at which point the vans would be sold exclusively as a Dodge product. DC Vans has since pulled back from this hard-line stance, and has in fact amended the record to note that it will not terminate its Sprinter agreements with Freightliner dealers, and that the Sprinter van will simply be "dual branded" for the foreseeable future. Indeed, despite the instant litigation, FOK and DC Vans continue to do business in Freightliner Sprinter vans pursuant to their

---

[1]Dodge is yet another subsidiary of DaimlerChrysler, AG.

dealer agreement, an agreement which has now been extended through the 2007 model of Freightliner Sprinter.  D. Ct. Op. at 4.

DC Vans' concession notwithstanding, FOK claims that the damage was done by the mere fact of having the rug pulled out from what it thought was an exclusive dealership agreement. Essentially, FOK claims that it would never have entered into the dealer agreement in the first place, nor invested $800,000 in its facility, had it known that DC Vans intended to distribute the Sprinter under both the Dodge and Freightliner brands.[2]  Furthermore, FOK maintains that DC Vans has engaged in discriminatory pricing by  offering Dodge dealers "special incentives with respect to sales of the Sprinter product."  Due to these incentives and "discounts," Dodge dealers were allegedly "able to offer the vans to the public at a significantly lower price than FOK was able to offer and still make a profit."

FOK filed suit in federal court against FLLC and DC Vans on October 11, 2005, bringing a total of eleven claims, some against both defendants and some only against DC Vans.  Jurisdiction was proper on the basis of diversity; additionally, because one of the claims arose under federal antitrust law, federal question jurisdiction was properly invoked.  All eleven claims were dismissed on the pleadings by the district court.  FOK now only requests that we review the following two aspects of its original claims, both of which are directed solely at DC Vans, not at FLLC: (1) whether it was proper for the district court to dismiss FOK's claims under the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-1301 to 1314; and (2) whether it was proper for the district court to dismiss FOK's claims under the federal Robinson-Patman Act, 15 U.S.C. §§ 13 (d) and (e).

II

We review *de novo* a district court's decision to dismiss under Fed. R. Civ. P. 12(b)(6). *Adika v. Smith*, 466 F.3d 503, 505 (6th Cir. 2006).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  This Court "must accept all facts in the complaint as true and construe the complaint liberally in favor of the plaintiff."  *Adika*, 466 F.3d at 505.

### A.  Claims under the Tennessee Trade Practices Act

The Tennessee Trade Practices Act ("TTPA") states that "[n]o supplier . . . may terminate, cancel, fail to renew or substantially change the competitive circumstances of a retail agreement without good cause."  Tenn. Code Ann. § 47-25-1302.  FOK's claims under the TTPA are twofold. First, it alleges that by dual-branding the Sprinter van and by selling the van through Dodge dealerships, DC Vans has effected a "substantial[] change in the competitive circumstances of a retail agreement."  Second, it claims that DC Vans constructively terminated the retail agreement, both by stating its intent to withdraw the van from Freightliner dealers and by providing competing Dodge dealers with the same Sprinter product on better terms than those offered to FOK.

In dismissing FOK's claims, the district court ruled that the TTPA does not apply to motor vehicles.  The TTPA defines a "retailer" as a "person, firm or corporation engaged in the business

---

[2]DC Vans strenuously maintains that it does not distribute, nor has it ever distributed, the *Dodge* Sprinter van. Appellee's Br. at 3 ("The only motor vehicle that DC Vans has ever distributed is the *Freightliner* Sprinter van.") (emphasis added).  When reviewing a 12(b)(6) motion to dismiss, however, we must accept the plaintiff's allegations as true even if the defendant vehemently denies such allegations.  Here, FOK alleges that DC Vans distributed not just the Freightliner Sprinter, but also the Dodge Sprinter. *See* Amended Compl. ¶¶ 53, 114-21.

of selling and retailing farm implements and machinery, construction, utility and industrial equipment, outdoor power equipment, attachments or repair parts and shall not include retailers of petroleum products." T.C.A. § 47-25-1301. FOK continues to assert that the Sprinter van qualifies as "industrial equipment" under the TTPA, as it is designed ostensibly for industrial use. DC Vans vigorously counters that the Sprinter is quite simply a motor vehicle, distinguishable from the common understanding of "industrial equipment," and that the presence of another Tennessee statutory scheme which provides for the licensing and regulation of motor vehicle sales, T.C.A. § 55-17-101 *et seq.*, suggests that the state legislature did not intend to include motor vehicles within the ambit of the TTPA. There are apparently no Tennessee authorities that definitively address whether "industrial equipment" includes motor vehicles used for industrial purposes under the TTPA.

We frankly find the language of the TTPA to be rather vague and unhelpful, and are disinclined to endorse the district court's sweeping interpretation of this statute without more guidance from the Tennessee legislature or courts. We find it unnecessary to resolve this dispute, however, because even assuming that the TTPA governs the distribution and sale of the Sprinter van, FOK has failed to allege facts that would amount to a violation of the statute.

First, FOK's claim that DC Vans has "substantially change[d] . . . the competitive circumstances of [the] retail agreement," is undercut by the plain terms of the retail agreement itself, which FOK quoted in relevant part in the Amended Complaint. In the retail agreement, DC Vans "retains all rights and discretion with respect to the manufacture, distribution, sales and service of motor vehicles, . . . including the rights (a) to sell and service Contract Goods in the Primary Market Area . . . (b) *to appoint other dealers in the Primary Market Area on terms and conditions deemed appropriate . . . .*" Amended Compl. ¶ 36 (emphasis added). This provision explicitly contemplates the sale of Sprinter vans through other dealers. Consequently, DC Vans's decision to sell the vans through Dodge dealers was actually provided for in the retail agreement. Neither the Amended Complaint nor FOK's brief identifies any portion of the retail agreement that precludes DC Vans from dual-branding the Sprinter van or from specifically selling it through Dodge. Nor does any portion of the amended complaint indicate that the retail agreement speaks to how the terms of the agreement between DC Vans and FOK should compare to the terms offered to any other dealers.[3] A straightforward reading of the agreement belies FOK's argument that DC Vans's business relationship with Dodge amounted to a change in the competitive circumstances of the retail agreement under the TTPA, as this relationship is explicitly anticipated in the agreement itself.

FOK makes a number of factual allegations pertaining to representations made by DC Vans prior to the execution of the retail agreement. The Amended Complaint alleges that based on these representations FOK was led to believe that Freightliner would be the exclusive dealer of the Sprinter van. *See* Amended Compl. ¶ 18. Even taken as true, the allegations of such representation are not enough for FOK's claim of changed competitive circumstances to survive, as they stand in stark contrast to the terms that were eventually included in the retail agreement. *See Staubach Retail Services-Southeast, LLC v. H. G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) ("The parol evidence rule does not permit contracting parties to 'use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract.' Furthermore, to allow a party to a contract to admit that the party signed the contract but to deny that the terms of the contract express the party's agreement would destroy the value of contracts." (internal citations omitted)). Moreover,

---

[3] This is not to say that other forms of relief that are based on differences between the terms offered to respective dealers and that find their source outside the contract, such as FOK's Robinson-Patman Act claim, are necessarily precluded by the retail agreement. Unlike other such forms of statutory relief, however, the TTPA incorporates the retail agreement by reference, and by so doing would appear to render unavailable a claim based on changed competitive circumstances to the agreement where the agreement itself provides such rights to the supplier.

DC Vans cannot be said to have somehow pulled a fast one on FOK by memorializing different terms than the parties discussed, as it had FOK sign a Release that discharged any prior obligations owed to FOK by DC Vans, including claims based upon any prior "agreement" or "representation." The retail agreement itself also stated that it "constitute[s] the Parties' entire agreement relating to selling and servicing Contract Goods," and "supercedes all prior negotiations, understandings and agreements, written or oral, relating to its subject matter." If FOK had any doubts about whether it maintained an exclusive right to sell the Sprinter van based on prior discussions between the parties, despite the contrary language in the retail agreement, the explicit provisions of the release and the retail agreement should have cleared them up. Any such representations were clearly and intentionally excluded from the retail agreement, and FOK cannot now rely on them to support its claim that DC Vans changed the agreement's competitive circumstances.

FOK also fails to allege facts to support its claim that DC Vans terminated the retail agreement. Although the complaint alleges that DC Vans constructively terminated the agreement by dual-branding the Sprinter vans and distributing them through Dodge, such distribution was specifically contemplated in the agreement. We would be hard-pressed to read FOK's factual allegations to include a claim of constructive termination of the agreement based on actions taken by DC Vans that were provided for by the very terms of the agreement itself.

Additionally, FOK contends that DC Vans terminated the agreement by advising FOK that it would stop distributing Sprinter vans under the Freightliner brand after 2005. This allegation could be read to present a claim for anticipatory breach, presenting us with the potentially interesting legal question of whether anticipatory breach amounts to "termination" under the TTPA. Yet FOK now concedes that DC Vans has decided not to withdraw the Freightliner Sprinter from the market and to offer an extension of the dealer agreement, effectively terminating its termination claim. This concession forces FOK to put all its eggs in the "changed competitive circumstances" basket based on the dual-branding of the vans, an argument which we reject under the terms of the contract as discussed above.

For these reasons, we affirm, albeit on different grounds, the district court's dismissal of FOK's claims under the TTPA.

### B.  Claims under the Robinson-Patman Act

The Robinson-Patman Price Discrimination Act ("RPA") amends portions of the Clayton Antitrust Act and is codified at 15 U.S.C. §§ 13(a), (d), and (e). FOK's amended complaint, however, alleges violations of §§ 13(d) and (e) only.[4] These two sections of the RPA "deal with discrimination in the field of promotional services made available to purchasers who buy for resale." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 521-22 (6th Cir. 2004). The language of the sections provides as follows:

> (d) *Payment for* services or facilities for processing or sale
> It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the

---

[4]Nowhere in FOK's original or amended complaint is §13(a) even mentioned, and Count XI—which outlines the RPA claims—refers exclusively to §§ 13(d) and (e). Thus, to the extent that FOK now argues that its complaint should be construed so as to encompass alleged § 13(a) violations as well, Appellant's Br. at 21-23, this argument comes too late. *See Clark v. National Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975) ("[T]here is no duty on the part of the trial court or the appellate court to create a claim which appellant has not spelled out in his pleading.") (internal quotation marks and parentheses omitted).

course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

(e) *Furnishing* services or facilities for processing, handling, etc.
It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13 (emphasis added). As this Court has said, if the seller (here, DC Vans) *pays* the retailer (here, Dodge dealerships) to perform the promotional service, § 13(d) applies. *Lewis*, 355 F.3d at 522. Whereas if the seller itself *provides* the promotional service to the retailer, § 13(e) applies. *Id.* This is often a fine distinction and thus the two sections "tend to be considered together" as a "harmonious whole." *Id.* At bottom, "[t]he aim of both sections is to eliminate devices by which preferred buyers obtain discriminatory preferences under the guise of promotional allowances." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1327 (6th Cir. 1983) (citing *Federal Trade Comm. v. Fred Meyer, Inc.*, 390 U.S. 341, 349-50 (1968)).

The "services or facilities" envisioned by the RPA are not explicitly defined within the text of the Act, but they have been construed to include "any kind of advertising, catalogs, demonstrators, display and storage cabinets, display materials, hand bills, special packaging or package sizes, warehouse facilities, accepting returns for credit, prizes or merchandise for conducting promotional contests, and 'monetary awards' paid by the seller to clerks, salesmen, and other employees of the customer for special sales or promotional efforts." *Lewis*, 355 F.3d at 522 (quoting *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F. Supp. 819, 851 (M.D. Tenn. 1974)); *see also* Barbara O. Bruckman, *Discounts, Discrimination, and Exclusive Dealing: Issues under the Robinson-Patman Act*, 68 ANTITRUST L.J. 253, 278 (2000) ("Section 2(d) has been applied to a broad range of promotional payments, including cooperative advertising programs, rebates that a retailer must pass to consumers, payments for customer mailings, payments for preferred shelf space, payments for institutional advertising (i.e., advertising the buyer's business generally), and unjustified off-invoice deductions for promotional allowances. 'Services' and 'facilities' covered by Section 2(e) have been held to include handbills, demonstrators, catalogues, cabinets, display racks, prizes or merchandise for conducting promotional contests, point-of-sale materials, advertising services, providing personnel whose salaries are paid in whole or in part by the seller, background music with periodic advertisements, letters announcing a new distributor but not mentioning competing distributors, special packaging or package sizes, and marketing support.") (citations omitted). The list is not exhaustive, however, for many incentives have been held not to be within the prohibitions of §§ 13(d) and (e), such as "a supplier's offering favorable credit terms or authorizing the extension of credit to select customers." *Cecil Corley Motor Co.*, 380 F. Supp. at 851 (internal citations omitted).

In its amended complaint, FOK states that because the Sprinter vans distributed by DC Vans to FOK and Dodge dealers were "of like grade and quality," and because the relevant consumer markets of the FOK and Dodge dealerships were geographically equivalent, DC Vans violated §§ 13(d) and (e) of the RPA by offering "incentives" to the Dodge dealers that it did not make available to FOK. Amended Compl. at ¶¶ 111-18. Specifically, FOK alleges that "DC Vans offers,

or has offered while FOK is a retailer of Freightliner Sprinter vans, the Dodge Sprinter van to Dodge dealerships in FOK's area of responsibility or market area with incentives that grant to Dodge dealerships the right to receive greater allocation of high demand Dodge brand heavy duty trucks." *Id.* at ¶ 118. Paragraph 53 of the amended complaint, which is incorporated by reference into the RPA count via paragraph 111, further states:

> FOK has suffered the effects of unfair competition from Dodge dealers with incentive packages not offered to FOK. Upon information and belief, DC Vans commenced selling the Sprinter vans through the Dodge Business Link program providing direct customer benefits such as first service bay priority and first service technician priority. These sales benefits were not available to Freightliner Sprinter customers. These benefits are valuable sales incentives and make a substantial difference as to where or from whom a potential customer will purchase a Sprinter product.

The "incentives" that FOK alleges were offered to Dodge dealers—and not to FOK—are thus twofold: (1) the right to receive more Dodge heavy-duty trucks, and (2) incorporation of Dodge Sprinters into the Dodge "Business Link" program, a service which apparently would give end users of a Dodge Sprinter some form of priority when having their van serviced at Dodge dealerships.

As to the first alleged incentive, it is unclear how close a nexus exists between DC Vans and the Dodge heavy-duty trucks — for while FOK alleges that DC Vans distributes the Dodge Sprinter, it does not allege that DC Vans distributes Dodge vehicles generally. Thus it is unclear how DC Vans would even have the power to provide those Dodge dealers that elected to market the Sprinter van with a "greater allocation of high demand Dodge brand heavy duty trucks." Appellee's Br. at 25. Furthermore, the alleged allocation of Dodge heavy-duty trucks would not appear to be a discriminatory practice under §§ 13(d) or (e). Even if true, it is a practice incident to the *original sale* of the Sprinter (i.e., the sale of the Sprinter from DC Vans to Dodge dealers) rather than incident to its subsequent *resale* (i.e., the resale of the Sprinter from a Dodge dealer to an end user). *See Bouldis*, 711 F.2d at 1328 (noting that "the extension of credit is a practice incident to the original sale rather than to the subsequent resale of the product, and, therefore, outside the coverage of §§ 2(d) & 2(e)"). While *Bouldis* dealt with a seller's extension of credit to various dealers, we see no reason why the same principles should not also apply to the seller's extension, as here, of a greater allocation of vehicles totally unrelated to the Sprinter.

As to the second alleged incentive, however, we cannot affirm the district court's decision, because our standard of review of a 12(b)(6) motion to dismiss requires that we "construe the complaint liberally in favor of the plaintiff." *Adika*, 466 F.3d at 505. In fact, the district court seems to have entirely passed over FOK's allegation that DC Vans violated the RPA by participating with its Sprinter vans in the Dodge "Business Link" program. While DC Vans likely did not create the Dodge "Business Link" program, a program which presumably predates by some time the introduction of the Sprinter van to Dodge dealerships, we cannot exclude the possibility that DC Vans somehow tied the distribution of the Sprinter van to this alleged incentive. And unlike the greater-allocation-of-heavy-duty-trucks incentive, the Business Link incentive may well be incident to *resale* of the Sprinter vans. *See Bouldis*, 711, F.2d at 1328. If end users who buy a Sprinter van from a Dodge dealer are, for example, given priority at that dealership in getting their van serviced (which is what "first service bay priority" and "first service technician priority" would seem to indicate), this is a promotional service provided directly to the consumer.

The critical question is likely to be whether DC Vans *payed* for these extra services with Dodge dealers and yet did not offer the same payments or equivalent incentives to FOK, or whether Dodge dealers already had the "Business Link" program in place and simply offered, of their own

accord, to provide these incentives to customers who purchased the Sprinter van. Without the benefit of discovery, however, it would seem virtually impossible for FOK to answer this question; for without discovery, we have no way of knowing exactly what the incentive structure was between DC Vans and its Dodge dealers, or if in fact such an incentive structure existed at all. *See also* Appellant's Br. at 20 ("Count XI should not have been dismissed without an opportunity for FOK to conduct discovery into the scope and manner in which the Dodge Business Link program benefits were provided to the Dodge Sprinter dealers."). FOK's claims under the RPA may well be highly speculative, and discovery may well reveal that they are futile, but we cannot—nor can the district court—make such a determination based on the pleadings alone.[5]

### III

Based on the above discussion, the judgment of the district court is **AFFIRMED** in full, except as to FOK's claims under the Robinson-Patman Act, which we **REVERSE and REMAND** for further proceedings. Specifically, FOK's allegation that DC Vans violated § 13(d) and (e) of the RPA should be allowed to proceed to discovery with respect to the theory asserted in Paragraph 53 of its amended complaint.

---

[5]We note that this Court's *Bouldis* decision, on which both the district court and DC Vans so heavily rely in rejecting FOK's claims under the RPA, was decided at the summary judgment stage, not the 12(b)(6) stage. There, a determination of which practices were "incident to the original sale" versus "incident to the subsequent resale" of a product was only made after the parties had "engaged in extensive discovery, including interrogatories, requests for documents and depositions." 711 F.2d at 1323. Only *after* discovery was the district court in *Bouldis* able to discern the true relationship between distributor, retailer, and consumer, and thus only *after* discovery was the court able to state with confidence that the plaintiff's §§ 13(d) and (e) claims were meritless. *Id.* at 1328-29.